[No. D056098. Fourth Dist., Div. One. Jan. 30, 2012.]

M&F FISHING, INC., et al., Plaintiffs and Respondents, v.
SEA-PAC INSURANCE MANAGERS, INC., et al., Defendants and
Appellants.

1512

COUNSEL

Sheppard, Mullin, Richter & Hampton, Robert S. Gerber, Karin Dougan Vogel and Matthew W. Holder for Defendants and Appellants.

Webb & Carey and Patrick D. Webb for Plaintiffs and Respondents.

OPINION

BENKE, Acting P. J.—This is an action alleging violations of the unfair competition law (UCL; Bus. & Prof. Code,[1] § 17200 et seq.) predicated on violations of the Insurance Code. M&F Fishing, Inc. (M&F), and C&F Fishing, Ltd. (C&F) (together, respondents), owned and operated commercial fishing companies. Between 1996 and 2003, respondents purchased commercial marine insurance from Sea-Pac Insurance Managers, Inc., doing business as Sea-Pac Insurance Services (Sea-Pac), Raleigh, Schwartz & Powell, Inc., Brown & Brown of Washington, Inc. (B&B Washington), a subsidiary wholly owned by Brown & Brown, Inc. (B&B), and Sharon Edmondson (Edmondson; together, appellants).

Respondents sued appellants in 2004 claiming they violated certain provisions of the Insurance Code in connection with the sale of such insurance

---

[1] Unless otherwise noted, all statutory references are to the Business and Professions Code.

because, among other allegations, appellants lacked a special lines' surplus lines broker license to sell insurance issued by a "nonadmitted" insurer (e.g., a carrier that has not submitted to Cal. regulation and supervision) and because appellants failed to provide respondents with a "disclosure statement" required for each placement of nonadmitted coverage. Respondents alleged these as well as other violations of the Insurance Code constituted unlawful conduct under the UCL. Following a bench trial, the trial court awarded respondents $3.5 million in restitution.

Appellants contend (1) the trial court erred as a matter of law in its liability findings because (a) at least part of the restitution awarded respondents was for insurance legally placed by appellants with an "admitted" carrier, and (b) respondents failed to establish injury in fact and/or loss of money as a result of any unfair business practice; (2) the trial court's restitution award is not supported by substantial evidence; and (3) as to B&B only, the trial court erred in refusing to grant its motion for nonsuit because there was no evidence that Edmondson, the broker primarily involved in the sale of marine insurance to respondents, was employed by B&B, that B&B was in an agency relationship with the other appellants and that B&B did anything wrong in connection with respondents' UCL claim.

As we explain, respondents are not entitled to restitution of *premiums and/or commissions* for *admitted* coverage because that insurance was lawfully placed by appellants. Respondents also are not entitled to restitution of *premiums* paid for *nonadmitted* coverage because there is undisputed evidence in the record that appellants fulfilled their duty as brokers and transferred all premiums paid by respondents to the nonadmitted insurers that issued the valid and enforceable marine policies.

However, respondents *may* be entitled to a return of the *commissions/broker fees* appellants received when placing marine insurance with a *nonadmitted* carrier. We say *may* because on remand the trial court must decide the threshold issue of whether respondents released their claim to recover such commissions/fees in the instant action in settlement of a related action with appellants. Depending on the outcome of that issue, respondents' entitlement to restitution of commissions/broker fees they paid appellants for placement of coverage with a nonadmitted carrier is limited, as we discuss, by the four-year statute of limitations in section 17208.

Finally, we conclude the trial court erred in denying B&B's motion for nonsuit.

In connection with respondents' cross-appeal, the trial court acted well within its discretion when, shortly before trial and the five-year cutoff to

bring an action to trial, it denied the motions of respondents to add dozens of new parties to their action. We also conclude in the cross-appeal that on remand the trial court should exercise its discretion and determine whether respondents are entitled, if at all, to an award of prejudgment interest on commissions/broker fees, if any, returned to respondents as restitution in accordance with this opinion.

## FACTUAL AND PROCEDURAL OVERVIEW[2]

M&F and C&F at all times relevant in this case owned tuna seiners that fished in American Samoa. Edmondson first started working as a broker selling marine insurance in 1963. Edmondson was initially introduced to respondents in 1996 in connection with the placement of marine insurance. During the period Edmondson placed marine insurance for respondents, she was employed by at least three different entities, each of which was named as a defendant in the case.

From 1996 to 2003, Edmondson placed at least[3] 153 policies for M&F and C&F, providing numerous, different types of insurance coverage for their businesses including protection and indemnity (P&I), which insures the vessel owner against third party claims; hull and machinery; war risk; cargo; electronics; fishing nets; skiff; and aviation (e.g., helicopter).

### A. *Admitted Versus Nonadmitted Carriers and Surplus Lines Coverage*

With limited exceptions, an insurer seeking to transact insurance business in California must be "admitted" for that purpose.[4] To become admitted, an insurer must obtain a "certificate of authority" from the Insurance Commissioner.[5] Historically, most marine insurance coverage is sold out of London and is placed by "nonadmitted" insurers (e.g., those insurers not entitled to transact business in Cal.).[6] The record shows that when Edmondson began placing marine insurance for respondents in 1996, there were no United States based companies, much less companies admitted in California, that wrote P&I insurance coverage for a tuna seiner.

---

[2] In their combined respondents' brief and cross-appellants' opening brief, respondents did not set forth a statement of facts.

[3] Respondents claim Edmondson and her employers actually placed 171 policies for them.

[4] Insurance Code section 24 (the word "admitted" means "entitled to transact insurance business in this state, having complied with the laws imposing conditions precedent to transaction of such business").

[5] Insurance Code section 700, subdivision (a).

[6] Insurance Code section 1760.1, subdivision (n) (a "nonadmitted insurer" includes "an insurer not licensed or admitted to engage in the business of insurance in this state in conformity with Section 700").

Relevant to the case at hand, a nonadmitted insurer may offer particular types of insurance coverage not offered in the admitted market. Because nonadmitted or "surplus lines" carriers[7] do not have a license to transact insurance business in California,[8] placements by nonadmitted carriers are effected by a class of specially licensed insurance brokers who are regulated by California's surplus line law.[9]

In light of the marketplace, marine insurance coverage is underwritten by a mixture of admitted and nonadmitted carriers. The marine insurance Edmondson placed for respondents was consistent with this model. As one of respondents' experts testified in his deposition that was read into the record at trial, the marketplace for marine insurance "is very restricted" and thus if a broker obtains "some admitted [coverage], that's sort of a miracle."

From the perspective of the surplus lines broker, one difference between admitted and nonadmitted marine insurance is the licensing required for a broker to sell such coverage. To sell marine insurance by admitted carriers in California, a broker must possess a property/casualty insurance license. Edmondson possessed the requisite license to sell admitted coverage in California.

Relevant to the instant case, to sell marine insurance in California issued by nonadmitted carriers a broker *also* must have a special lines' surplus lines license. (See Ins. Code, § 1760.5, discussed *post.*) However, neither Edmondson nor the brokerage firms where she worked possessed such a license during most times relevant in this case.

For years during the relevant time period, Edmondson placed without incident marine insurance for respondents with both admitted and nonadmitted carriers. M&F and C&F each had claims that were paid by both admitted and nonadmitted carriers while Edmondson acted as their broker. In addition,

---

[7] 2 New Appleman on Insurance (Law Library ed. 2011) section 8.04[3], page 8-36 (rel. 5-9/2011).

[8] Insurance Code section 1776 (providing in part that the "permission granted in this chapter to place any insurance in a nonadmitted insurer shall not be deemed or construed to authorize any insurer to do business in this state").

[9] Insurance Code section 1761, subdivision (a) ("Except as provided in Sections 1760 and 1760.5, and paragraphs (1) and (2) of subdivision (b), a person within this state shall not transact any insurance for a home state insured with nonadmitted insurers, except by and through a surplus line broker licensed under this chapter and upon the terms and conditions prescribed in this chapter."); see also 10 Cal. Code Regs., § 2132, subd. (b) (the surplus line law "is designed only to provide a medium through which citizens of this state may obtain from nonadmitted insurers coverage not readily procurable from admitted insurers"); see generally 5 Cal. Insurance Law & Practice (2011) Surplus Line Brokers, § 62.01, page 62-3 (rel. 73-12/2011).

the insurance obtained by Edmondson for respondents satisfied National Marine Fishery Service, the entity which held a first preferred ship mortgage on three of the vessels owned by respondents.

In 1997 Edmondson brokered on behalf of C&F a P&I policy (No. 97/09012) issued by FAI, an Australian company (FAI). The following year, Edmondson placed a P&I policy (No. 98/05066/01) issued by FAI for M&F. Although FAI was a nonadmitted carrier in California, it was on a list of acceptable nonadmitted carriers—called LESLI, an acronym for "List of Eligible Surplus Lines Insurers"—maintained by the Surplus Line Advisory Association, an organization that performs certain duties delegated to it by the Insurance Commissioner.[10]

Edmondson first learned she needed such a license in late March 2003, during a deposition in another case. Until that time, Edmondson generally had been relying on her employer to do her "licensing investigation" and satisfy all licensing requirements in various states where she placed coverage, including in California. Edmondson on her own obtained a special lines' surplus lines license in mid-September 2003 and Edmondson's employer paid the premium on the surety bond—about $100—that was a condition for licensure.

### B. Claims Made on Nonadmitted Coverage Issued by FAI and Lloyds Underwriters

In 1998, Jaoa Virrissimo, a seaman working on the seiner owned by C&F, was injured while lifting salt bags. At about the same time, John Alves was injured while working on a seiner owned by M&F when his foot got caught in a fishing net. Both seamen made claims against the FAI policies, and both of those claims were paid by FAI for about three years. However, in March 2001, FAI became insolvent and payments on both claims stopped.

---

[10] Insurance Code section 1780.50 ("(a) The Legislature finds and declares that consumers in the State of California have insurance needs which cannot always be met through the admitted insurance market. For this reason, many insurance consumers need access to insurance underwritten by nonadmitted insurers, as permitted by law. To help ensure that insurance consumers have access to financially sound and reputable nonadmitted insurers, it is in the public interest to authorize a surplus line advisory organization within the State of California to perform certain duties delegated by the Insurance Commissioner, as provided in this chapter. [¶] (b) The Legislature further finds and declares that it is in the public interest for the surplus line advisory organization authorized under this chapter to be composed of surplus line brokers or persons involved in the business of surplus line insurance. The advisory organization's activities shall constitute an integral part of the business of insurance. The advisory organization will facilitate the state's ability to monitor and regulate the transfer of risk on a sound basis through surplus line brokers to nonadmitted insurers in accordance with Chapter 6 (commencing with Section 1760) and may perform certain functions in this state's system of monitoring and regulating the persons and entities involved in this state in the surplus line segment of the insurance industry.").

Virrissimo subsequently sued C&F in the United States District Court for the Southern District of California, case No. 01 CV 0776 B (LAB). C&F settled that case in March 2003 by paying Virrissimo $200,000 within certain time parameters and by giving Virrissimo a promissory note secured by a mortgage and lien in the principal amount of $600,000. Thereafter, C&F sued Sea-Pac, Raleigh, Schwartz & Powell, Inc., B&B Washington and Edmondson for professional negligence in San Diego County Superior Court (*C&F Fishing Ltd. v. Sea-Pac Ins. Managers Inc.* (No. GIC826768)), as a result of the FAI insolvency and the Virrissimo claim settled by C&F (Virrissimo professional negligence action).

The errors and omissions carrier for B&B Washington, Philadelphia Indemnity Insurance Company (PIIC), settled the Virrissimo professional negligence action by paying C&F $895,000 for a *partial* release of all claims. In return for the payment, C&F agreed to release all of its "claims, causes of action and damages, alleged in [the Virrissimo professional negligence action], including the claim for return of the premium for policy No. 97/09012 . . . ." Allegedly carved out of the partial release were any claims made in the instant action.

Alves also sued M&F, which in turn settled with him after Alves's claim caused the seiner owned by M&F to be "arrested" in American Samoa as security pursuant to the Jones Act (46 U.S.C. Appen. § 688). At the time of its arrest, the vessel was fully provisioned and ready to go to sea.

M&F initially sued, among others, the carrier, Lloyds Underwriters (Lloyds), that had issued port risk coverage for the vessel after it had been arrested and placed under the care of a substitute custodian.[11] When that suit and others ultimately proved unsuccessful, M&F sued Sea-Pac, Raleigh, Schwartz & Powell, Inc., B&B Washington and Edmondson for professional negligence in San Diego County Superior Court (*M&F Fishing Inc. v. Sea-Pac Ins. Managers Inc.* (No. GIC826767)) (Alves professional negligence action). PIIC also settled the Alves professional negligence action, paying M&F $4 million for a *partial* release of all claims. Similar to the C&F release, the M&F release included within its scope "all claims, causes of action and damages, alleged in [the Alves professional negligence action]"

---

[11] We grant appellants' unopposed request for judicial notice to include in the record (A) the June 17, 2008 order granting in part and denying in part the motion for summary judgment of certain defendants in case No. 06CV0934 DMS (BLM) titled *M&F Fishing, Inc. v. Certain Underwriters at Lloyds*; (B) the September 29, 2008 order granting in part and denying in part the motion for summary judgment of certain defendants in the same case; (C) the memorandum decision filed February 16, 2010, by the Ninth Circuit Court of Appeals in the same case; and (D) an unpublished decision by this court filed October 2, 2009, affirming the judgment in favor of defendant in *M&F Fishing, Inc. v. Copitas* (D052389).

but unlike the C&F release it did not include the premium paid for the nonadmitted coverage issued by FAI.

## C. *Premiums and Commissions Paid by Respondents*

C&F paid $87,993 in premiums and $8,799 in commissions for the FAI policy that partially covered the Virrissimo claim. In contrast, C&F paid $783,556 in premiums and $120,693 in commissions for all of the admitted coverage, and $972,009 in premiums and $113,747 in commissions for nonadmitted coverage, procured through Edmondson and appellants, for a total of $1,755,565 in premiums and $234,440 in commissions.

M&F paid $85,000 in premiums and $8,500 in commissions for the FAI policy that covered in part the Alves claim and $23,700 in premiums and $2,370 in commissions for the Lloyds port risk coverage. M&F paid $845,664 in premiums and $126,808 in commissions for all of the admitted coverage, and $914,292 in premiums and $112,617 in commissions for nonadmitted coverage placed by appellants, for a total of $1,759,956 in premiums and $239,425 in commissions.

## D. *The Instant Action*

Respondents sued appellants in March 2004. Respondents in their complaint asserted a section 17200 claim on their own behalf and on behalf of all others similarly situated based on appellants' alleged violations of various provisions of the Insurance Code, and asserted causes of action for negligence per se and declaratory relief. Respondents subsequently dismissed their negligence per se cause of action.

At trial, respondents' accounting expert opined C&F was entitled to $3,134,584 and M&F to $1,992,063, or a total of $5,126,647, in restitution. This amount was comprised of *all* premiums and commissions respondents paid for the 153 (or more) policies of both nonadmitted *and* admitted coverage appellants had placed for them from 1996 to 2003.

After 11 days of trial, the court issued its tentative decision finding appellants liable for unfair business practices under section 17200. The trial court initially awarded respondents $3.5 million in restitution without dividing the award between C&F and M&F. After appellants objected to the lump-sum award and various other findings made by the trial court, the court issued its statement of decision (SOD), entered judgment and adopted the allocation of the $3.5 million restitution award suggested by respondents, which was based on the relative proportion of the total premiums each paid during the relevant time period. As a result, the court awarded C&F

$2,140,003 and M&F $1,359,997 in restitution. The trial court subsequently denied appellants' motion for new trial and respondents' request for prejudgment interest in excess of $5 million.

## DISCUSSION

## I

*Appeal*

### A. *Restitution for Violation of Section 17200*

Appellants claim the trial court erred as a matter of law in awarding restitution to respondents because respondents were not entitled to an award based on premiums and/or commissions paid for insurance lawfully placed and because the award was not supported by the law or the evidence.

### 1. *Additional Background*

After several objections to the preliminary SOD, the trial court in the SOD[12] found respondents violated section 17200 resulting in injury in fact and damages to respondents, reasoning as follows:

"[S]ection 17200 defines 'unfair competition' in relevant part to mean '. . . any unlawful, unfair or fraudulent business act or practice . . . [.]'

"The [appellants] violated 17200 . . . when they unlawfully violated the various insurance code sections, some of which resulted in [respondents'] harm. Specifically, the [appellants] violated: (1) Insurance Code Section[] 1760.5, selling non-admitted coverage without a license, the appropriate special lines surplus lines license; (2) Insurance [C]ode section 382 for a failure to deliver the policies within 90 days; (3) Insurance Code section 1764.1, failure to deliver the disclosure statement; and (4) Insurance Code Section 1764.4 for failure to deliver the underwriter's signature authentication.

"The uncontroverted evidence from Ms. Edmondson was that she had no special lines' surplus lines license until September 12, 2003. There was

---

[12] In a nonjury trial, the trial court's SOD sets forth its reasoning regarding the disputed issues and is the "touchstone to determine whether or not the trial court's decision is supported by the facts and the law." (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718 [30 Cal.Rptr.2d 745].) On appeal from the ensuing judgment, we review the trial court's conclusions of law independently and its findings of fact for substantial evidence. (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513 [75 Cal.Rptr.3d 771]; *Swanson v. Skiff* (1979) 92 Cal.App.3d 805, 808 [155 Cal.Rptr. 280].)

uncontroverted evidence that Brown & Brown[13] failed to obtain that license even after they learned of the problem in [a separate action]. Ms[.] Edmondson testified that there was no disclosure statements delivered to [respondents] and that she never told the [respondents] about the insurance being placed with non-admitted carriers. These acts are the unlawful violations which ultimately caused [respondents'] harm.

"There was testimony from Mr. Finete [(a shareholder of C&F)] and Mr. Ferriera [(the president of M&F)] that [appellants] never told them that they were selling M&F and C&F insurance coverage with a non-admitted carrier. [Appellants] didn't tell M&F and C&F anything about the California Insurance Guarantee Association and whether it would apply to any of the coverage Ms. Edmondson was placing on behalf of either plaintiff. Further, the [appellants] never discussed the fact that some of the insurers were not subject to the financial solvency regulations in California.

"There was also testimony from the [respondents] that had they been told the coverage was going to be placed with a non-admitted underwriter, they would have been willing to pay more for the coverage to avoid the inherent risk associated with non-admitted carriers.

"According to the testimony of Mr. Paulin [(an expert of respondents)], [respondents] suffered unpaid losses in excess of $10 million when the non-admitted underwriters failed to pay on the submitted claims. This included losses not paid by FAI Insurance Company of Australia and various Lloyds' and London Underwriters, of all three vessels, on various personal injury, hull and machinery, net and port risk claims. Mr. Paulin also testified that the non[-]admitted coverage was not worth the amount of the premiums paid for it by the [respondents].

"The Court finds that the [respondents] have met their burden and that there was a violation of [section] 17200, which resulted in injury in fact and loss caused by the [appellants'] unlawful acts—or practices."

The trial court next addressed whether restitution should be awarded for appellants' violation of section 17200:

"[Respondents] take the position that the [appellants] cannot be allowed to keep any of the premiums they acquired through the means of their unfair competition, since they obtained all of that business in violation of . . . section 17200. [Respondents] further claim that [appellants] not be allowed to 'cherry

---

[13] It is not clear from the SOD whether the trial court was referring to B&B, or its subsidiary, B&B Washington, although from the evidence it would appear to be the latter.

pick' for restitution only those premiums for non-admitted lines of coverage, which they sold coverage together with admitted coverage as a package as part of a scheme to unfairly compete in California. [Respondents] request that all premiums paid by [respondents] ($5,126,647) plus interest ($4,707,656) be awarded in the total amount of $9,834,303. (Exhibit 70[.])

"[Appellants] take the position that if the Court finds in favor of the [respondents] that the amount of restitution should not exceed the amount of the commissions the [appellants] received. [Appellants] calculate that amount to be no more than $62,179 the total amount of the post[-]March 2000 commissions and $768,897 for all the commissions paid by . . . both [respondents] for the entire eight year time frame. (Testimony from Mr. Kaplan[.])

"The Court of Appeal in Day v. AT&T (1998) 63 CalApp4th 325 [74 Cal.Rptr.2d 55] defined what section 17203 'restitution means: we think it significant that the Legislature chose to use the word "restore" in labeling that which an offending defendant may be ordered to do. The verb, as defined by the Oxford English Dictionary means "[t]o give back, to make return or restitution of" anything previously taken away or lost.' The Day court went on to state that 'the notion of restoring something to a victim of unfair competition includes two separate components. The offending party must have obtained something to which it was not entitled and the victim must have given up something which he or she was entitled to keep.' In this case, the [appellants] collected premiums from [respondents] in the amount of $5 million to be given to the insurers minus their commissions for the illegal placement of commercial liability coverage with non-admitted underwriters.

"Based on the fact that the Court finds an agency relationship existed between the parties, the Court may look beyond the commission received. (See Maloney [v. Rhode Island Ins. Co.] (1953) 115 Cal.App.2d 238 [251 P.2d 1027].) Further, the parties agree that the Court has wide discretion when determining the amount of restitution to be awarded. The parties also agree that the Court should consider what is equitable to both sides.

"The [C]ourt has considered the totality of the evidence and weighed the equities addressed by the parties in their trial briefs and at the time of trial and concludes that the [appellants] should be required to pay [respondents] restitution for their violation of the UCL. However, the [C]ourt notes that the [respondents] elected to not rescind the contracts, thereby reaping a benefit by having viable coverage with the portions of the insurance coverage with the admitted carriers. Balancing the equities and considering the evidence the [C]ourt awards [respondents] the total amount of $3.5 million. M&F[] is entitled to $1,359,997 and C&F[] is entitled to $2,140,003. [Appellants] also

requested that the [C]ourt allocate the damages between the respective [appellants]. The [C]ourt believes that the evidence in this case supports a finding that all [appellants] (1) participated in the illegal conduct herein; and (2) were in an agency relationship with one another. Moreover, the [C]ourt notes that [appellants] presented no evidence or argument concerning allocation at the time of trial. Therefore the request for allocation amongst the [appellants] is denied."

## 2. *Standard of Review*

A trial court's construction of the relevant statutes, including the UCL and various provisions of the Insurance Code, is subject to our de novo review. (See *Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1092 [61 Cal.Rptr.3d 716] (*Daro*); see also *Reis v. Biggs Unified School Dist.* (2005) 126 Cal.App.4th 809, 816 [24 Cal.Rptr.3d 393].) We review any factual determinations that bear upon the standing issue under the substantial evidence standard. (*Daro, supra,* at p. 1092; see also *Taxpayers for Livable Communities v. City of Malibu* (2005) 126 Cal.App.4th 1123, 1126 [24 Cal.Rptr.3d 493].)

## 3. *Restitution Is Limited to Unlawful Acts and Practices*

As a threshold matter, appellants claim they cannot be liable for restitution under section 17200 for insurance lawfully placed between 1996 and 2003. We agree.

■ On a finding of unfair competition, the UCL authorizes restitution only of money or property that "may have been acquired by means of such unfair competition." (§ 17203.)[14] "While the scope of conduct covered by the UCL is broad, its remedies are limited." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*).)

Our Supreme Court "previously found that the Legislature did not intend section 17203 to provide courts with *unlimited* equitable powers." (*Korea*

---

[14] Section 17203 provides: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state."

*Supply, supra*, 29 Cal.4th at p. 1147.) In *Korea Supply* our high court reaffirmed its rejection of the argument that the general grant of equitable authority in section 17203 implicitly permitted a disgorgement remedy. (29 Cal.4th at p. 1147.) Instead, the court found that because "there was nothing in the express language of the statute or its legislative history indicating that the Legislature intended to provide such a remedy, the remedy was not available." (*Ibid.* [concluding a court is not authorized to order a defendant to disgorge all profits to a plaintiff who lacked an ownership interest in those profits].)

In reaching its decision in *Korea Supply*, the court looked to the language of section 17203 and the policy objectives underlying the statute and found it "clear that the equitable powers of a court are to be used to 'prevent' practices that constitute unfair competition and to 'restore to any person in interest' any money or property acquired through unfair practices. (§ 17203.) While the 'prevent' prong of section 17203 suggests that the Legislature considered deterrence of unfair practices to be an important goal, the fact that attorney fees and damages, including punitive damages, are not available under the UCL is clear evidence that deterrence by means of monetary penalties is not the act's sole objective. A court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes might deter unfair practices. The fact that the 'restore' prong of section 17203 is the only reference to monetary penalties in this section indicates that the Legislature intended to limit [in individual private actions brought under the UCL] the available monetary remedies under the act." (*Korea Supply, supra*, 29 Cal.4th at pp. 1147–1148 & fn. 6.)

■ We conclude respondents are not entitled to restitution for insurance lawfully placed by appellants, namely for coverage placed from *admitted* carriers. Indeed, there is no dispute that Edmondson and/or her employers were properly licensed to broker admitted coverage. Allowing respondents restitution for lawfully placed insurance is contrary to the language of section 17200, which states "unfair competition" means and includes, among other things not relevant here, "any unlawful, unfair or fraudulent business act or practice." Clearly, there can be no restitution for acts or practices that were not unlawful.

In addition, we reject the argument of respondents that because appellants sold respondents marine insurance from both admitted and nonadmitted carriers that somehow the "bundling" (a term coined by respondents) of such coverage by appellants turned what were otherwise lawful acts and practices into unlawful ones for purposes of the UCL.

Although *respondents* had the burden to establish which of appellants' placements of insurance violated the Insurance Code and was thus unlawful

under section 17200 et seq. (see *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 878 [85 Cal.Rptr.2d 301]), the record shows *appellants'* economic expert testified he prepared "Excel spreadsheets" that "detailed every policy [written on behalf of respondents during the relevant time period] and included identification of the policy, the carrier, the premium, the commission, and [that he] segregated . . . the policies . . . by admitted and nonadmitted" coverage.[15] Thus, the record shows it not only was possible to determine which coverage was placed by admitted and nonadmitted insurers during the relevant time period, but that this analysis was undertaken by appellants in the instant case.

Here, the trial court in the SOD did not specifically fix the $3.5 million restitution award in favor of respondents to any of the evidence at trial, but instead reached this figure after "[b]alancing the equities" and "consider[ing] the totality of the evidence," and after noting respondents suffered in excess of $10 million in losses and paid premiums and commissions for policies placed by appellants.

However, given the $3.5 million award was about 68 percent of all premiums (including commissions) paid by respondents (e.g., $3.5 million divided by $5,126,647), and given admitted coverage accounted for about 47 percent of all insurance premiums and commissions paid by respondents, it is clear the trial court's restitution award included some premiums and commissions respondents paid for *admitted* insurance coverage.

■ We decline to adopt a rule allowing a party restitution for acts or practices that were not actionable under the UCL merely because the wrongdoer also allegedly engaged in *separate and distinct* acts that were found to constitute "unfair competition" under the statutory scheme. (See *Korea Supply, supra*, 29 Cal.4th at pp. 1147–1148 & fn. 6.) We thus conclude the trial court erred as a matter of law when it ordered restitution of premiums and commissions paid for admitted coverage, when the record shows such payments were capable of quantification and could and were separated from those collected for nonadmitted coverage, and thus subject to proof. (See *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 178 [96 Cal.Rptr.2d 518, 999 P.2d 706] ["restitutionary awards encompass quantifiable sums one person owes to another . . ."].)

---

[15] The record also shows respondents objected to, and the trial court subsequently denied, appellants' request for judicial notice of a March 4, 2009 letter from California's Department of Insurance listing admitted and nonadmitted carriers issuing marine insurance during the period relevant in this lawsuit.

### 4. *Loss of Money or Property Under Section 17200*

Appellants next argue respondents cannot satisfy the standing requirements to assert a claim under the UCL because respondents did not suffer injury in fact and/or loss of money or property caused by that injury.

When respondents filed this action in March 2004, the UCL's standing requirements for private individuals were more lenient. Previously, the UCL "authorized 'any person acting for the interests of itself, its members or the general public' (former § 17204) to file a civil action for relief. Standing to bring such an action did not depend on a showing of injury or damage." (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 228 [46 Cal.Rptr.3d 57, 138 P.3d 207] (*Mervyn's*).)

In the November 2004 General Election, the UCL was amended by Proposition 64 to prevent "*uninjured* private persons from suing for restitution on behalf of others. This is a consequence of section 17203 (as amended by Prop. 64, § 2), which provides that '[a]ny person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure . . . .' " (*Mervyn's, supra,* 39 Cal.4th at p. 232, fn. omitted.)

Proposition 64 "changed the standing requirements for a UCL claim to create a two-pronged test: A private person now has standing to assert a UCL claim only if he or she (1) 'has suffered injury in fact,' and (2) 'has lost money or property as a result of the unfair competition.' (Bus. & Prof. Code, § 17204; see *Mervyn's, supra,* 39 Cal.4th at p. 227.) Proposition 64 accomplished that change by amending Business and Professions Code section 17204, which prescribes who may sue to enforce the UCL, by deleting the language authorizing suits by any person acting on behalf of the general public and by replacing it with the phrase, 'who has suffered injury in fact and has lost money or property as a result of the unfair competition.' (Bus. & Prof. Code, § 17204; see *Mervyn's, supra,* 39 Cal.4th at p. 228.)" (*Hall v. Time Inc.* (2008) 158 Cal.App.4th 847, 852 [70 Cal.Rptr.3d 466].)

Our Supreme Court in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 325 [120 Cal.Rptr.3d 741, 246 P.3d 877] (*Kwikset*) recently explained that because "economic injury is itself a form of injury in fact, proof of lost money or property will largely overlap with proof of injury in fact. [Citation.] If a party has alleged or proven a personal, individualized loss of money or property in any nontrivial amount, he or she has also alleged or proven injury in fact. Because the lost money or property requirement is more difficult to satisfy than that of injury in fact, for courts to

first consider whether lost money or property has been sufficiently alleged or proven will often make sense. If it has not been, standing is absent and the inquiry is complete. If it has been, the same allegations or proof that suffice to establish economic injury will generally show injury in fact as well [citation], and thus it will again often be the case that no further inquiry is needed." (Fn. omitted.)

The SOD provides that appellants violated four Insurance Code sections but also vaguely concludes that only *"some* of [the violations] resulted in [respondents'] harm." (Italics added.) On closer reading, the SOD provides two separate violations of the Insurance Code "ultimately caused Plaintiffs' harm," namely appellants' placement of marine coverage from nonadmitted carriers without a special lines' surplus lines license (Ins. Code, § 1760.5[16]), and appellants' failure to deliver disclosure statements to respondents and provide them the required notice in connection with the placement of marine insurance with nonadmitted carriers.[17] (See *id.,* § 1764.1.[18])

Moreover, as we have noted the SOD finds respondents "suffered unpaid losses in excess of $10 million when the non-admitted underwriters failed to

---

[16] Subdivision (b) of Insurance Code section 1760.5 provides in part: "The insurance specified in paragraphs (2), (3), and (4) of subdivision (a) [(which includes marine insurance)] may be placed with a nonadmitted insurer for a home state insured only by and through a special lines' surplus line broker. The license of a special lines' surplus line broker shall be applied for and procured and shall be subject to the same fees for filing on issuance in the same manner as the license of a surplus line broker, except that in lieu of the bond required by Section 1765, there shall be delivered to the commissioner a bond in the form, amounts, and conditions specified in Sections 1663 and 1665 for an insurance broker and only one fee shall be collected from one person for both licenses."

[17] Our own review of the record shows the other two statutory violations of the Insurance Code (e.g., §§ 382 [failure to deliver policies within 90 days], 1764.4 [failure to deliver the underwriter's authentication of documents]) did not cause respondents any harm, as the SOD, in any event, appears to find. (See *Kwikset, supra,* 51 Cal.4th at p. 326 [to state a claim under the UCL a plaintiff must show that plaintiff's economic injury came " 'as a result of' the unfair competition" and the " 'phrase "as a result of" in its plain and ordinary sense means "caused by" ' "].)

[18] Subdivision (b) of Insurance Code section 1764.1 governs the notice requirements when insurance is being sought or placed by a surplus lines broker with a nonadmitted carrier. In addition to providing notice that a nonadmitted insurer is not licensed (Ins. Code, § 1764.1, subd. (b)1) or subject to financial solvency regulation and enforcement (*id.,* subd. (b)2) in our state, subdivision (b)8 provides: " 'IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.' "

pay on the submitted claims." The SOD awarded respondents $3.5 million in restitution without connecting that award to any specific premiums or commissions paid by respondents, as we noted *ante*, or even to categories of premiums or commissions such as those related to admitted as opposed to nonadmitted carriers. (See *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 676 [38 Cal.Rptr.3d 36] [reversing restitution award because there was no evidence to support the trial court's computation of the amount of that award, where the trial court had "balanced the equities of the case" and chosen 25 percent of gross receipts as the basis for its award against the manufacturer who wrongfully represented its tools were " 'Made in U.S.A.,' " when in fact parts of those products were manufactured elsewhere].)

To the extent the trial court based respondents' $3.5 million restitution award on respondents' losses in excess of $10 million stemming from the claims of the seamen, we conclude that was error. The $10 million in losses arose when the two nonadmitted carriers, Lloyds and FAI, failed to pay or discontinued paying, respectively, on the submitted claims involving Virrissimo and Alves. Those damages are not recoverable in a UCL action. (See *Korea Supply, supra*, 29 Cal.4th at p. 1144 [a plaintiff may recover restitution under § 17200 but not damages].) Moreover, those damages were released by respondents in settlement of their respective professional negligence actions against appellants.

We also agree with appellants that respondents did not lose money or property for purposes of the UCL based on the "inherent risk" associated with nonadmitted carriers, as found by the trial court. We need not speculate here whether the "inherent risks" associated with coverage placed by nonadmitted carriers actually caused respondents to lose money or property for purposes of section 17204 because the record shows they did not. Indeed, the record shows only three of the policies placed by nonadmitted insurers did not fully cover claims submitted by respondents. Any damages from these three policies were released by respondents in their earlier settlements with appellants.

Finally, we also agree with appellants that respondents are not entitled to restitution of *premiums* paid for *nonadmitted* coverage because appellants could not be required to return something that did not belong to them and was the property of the insurer. (See *Day v. AT & T Corp., supra*, 63 Cal.App.4th at p. 340 [under the UCL the act of "restoring something to a victim of unfair competition includes two separate components," to wit:

"[t]he offending party must have obtained something to which it was not entitled *and* the victim must have given up something which [the victim] was entitled to keep."]; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1268 [10 Cal.Rptr.2d 538, 833 P.2d 545] [with restitution, a " 'defendant is asked to return something [the defendant] wrongfully received; [the defendant] is not asked to compensate the plaintiff for injury suffered as a result of [the defendant's] conduct.' "]; cf. *Maloney v. Rhode Island Ins. Co., supra,* 115 Cal.App.2d at p. 251 [concluding a premium collected by the broker and placed in a trust account, like here, belonged not to the broker or the insured, but rather to the insurer because the premium was an "asset" of the insurer and "[i]t was, through the medium of appellants' agency, constructively in the possession of [the insurer]" while held in trust by the broker].)[19]

We also perceive the policy objectives of the UCL, including deterring unfair competition (see *Korea Supply, supra,* 29 Cal.4th at pp. 1147–1148 & fn. 6), would in no way be furthered if appellants were required to return premiums they lawfully collected and held in trust on behalf of the nonadmitted carriers that issued the valid and enforceable coverage. (See *Medina v. Safe-Guard Products, Internat., Inc., supra,* 164 Cal.App.4th at p. 112 [contract of insurance is not rendered unenforceable merely because the insurer who issued it was not licensed to sell insurance in Cal.].)

There also is no finding in the SOD that appellants benefited from their collection and transfer of premiums, as opposed to the commissions/brokers fees (discussed *post*) paid by respondents for nonadmitted coverage. (Cf. *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1339–1342 [90 Cal.Rptr.3d 589] (*Troyk*) [defendants subject to claim of restitution for service charges paid directly by consumers to a third party because defendants received a benefit from the payment of such charges and because defendants and the third party acted as a single enterprise—as alter egos of each other—and thus any payment to the third party "should be treated as if paid to [defendants]"]; *Shersher v. Superior Court* (2007) 154 Cal.App.4th 1491, 1493 [65 Cal.Rptr.3d 634] [money paid to a third party retailer to purchase products of defendant based on the alleged false advertising of defendant subject to claim for restitution from defendant who benefited from the transaction].)

---

[19] With the exception of the three policies where claims were not paid or where payments were discontinued, the record shows all other policies placed by nonadmitted (and admitted, for that matter) carriers proceeded without incident, provided coverage to respondents and any claims based on such policies were paid on those policies in the regular course. (See *Medina v. Safe-Guard Products, Internat., Inc.* (2008) 164 Cal.App.4th 105, 112 [78 Cal.Rptr.3d 672] [contract of insurance is not rendered unenforceable merely because the insurer who issued it was not licensed to sell insurance in Cal.].) Thus, for this separate and independent reason we conclude respondents did not suffer any "loss of money or property" for purposes of the UCL in connection with the premiums they paid for such coverage.

Nor are we willing on this record to infer such a finding, particularly given the stipulation of respondents that appellants' general practice was to transfer to the nonadmitted carriers the premiums collected by appellants and given the lack of any evidence in the record that appellants failed at any time between 1996 and 2003 to fulfill their duty to make such transfers.[20] For these reasons, respondents are not entitled to restitution of *premiums* paid for *nonadmitted* coverage.

Appellants did, however, retain the commissions they earned from placement of the nonadmitted coverage. Appellants argue that any violation of either Insurance Code section 1760.5 or 1764.1 did not *cause* respondents' harm under the UCL.

■ Without deciding whether appellants' violation of Insurance Code section 1760.5 caused respondents harm,[21] we note respondents suffered harm caused by a violation of Insurance Code section 1764.1. As we noted *ante*, this statute governs the notice requirements when insurance is being sought or placed by a surplus lines broker with a nonadmitted carrier. In addition to providing notice that a nonadmitted insurer is not licensed or subject to financial solvency regulation and enforcement in our state (Ins. Code, § 1764.1, subd. (b)1, 2), subdivision (a)(2) of Insurance Code section 1764.1 sets out the remedy available for failure to comply with the disclosure requirements. It provides: "In a case in which the applicant [of the insurance policy] has not received and completed the signed disclosure form required by this section, he or she may cancel the insurance so placed. The cancellation shall be on a pro rata basis as to premium, *and the applicant shall be entitled to the return of any broker's fees charged for the placement*." (Italics added.)

---

[20] When "omissions or ambiguities in the statement are timely brought to the trial court's attention, [(as here)], the appellate court will not imply findings in favor of the prevailing party." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227]; see also Code Civ. Proc., § 634 ["When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal or upon a motion under Section 657 or 663 that the trial court decided in favor of the prevailing party as to those facts or on that issue."].)

[21] Even if we relied on a violation of Insurance Code section 1760.5 as the basis to show respondents suffered harm under section 17200, any award of restitution under section 1760.5 would appear to be more limited (e.g., to commissions/broker fees appellants collected on the policies involving the claims by Virrissimo and Alves) than an award under section 1764.1 (which as noted *post*, provides a statutory remedy for its violation).

Thus, under Insurance Code section 1764.1, subdivision (a)(2), appellants *may*, as we discuss *post*, be entitled to the return of "any broker's fees charged for the placement" of insurance with nonadmitted carriers that did not comply with the disclosure requirements provided in this statute.

### 5. *Scope of Releases Executed by Respondents*

As we noted *ante*, both respondents in settlement with appellants released "all claims, causes of action and damages" asserted in their respective professional negligence actions against appellants.

██ "Contract principles apply when interpreting a release, and 'normally the meaning of contract language, including a release, is a legal question.' [Citation.]" (*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1356 [129 Cal.Rptr.2d 197].) "Where, as here, no conflicting parol evidence is introduced concerning the interpretation of the document, 'construction of the instrument is a question of law, and the appellate court will independently construe the writing. [Citation.]' " (*Paralift, Inc. v. Superior Court* (1993) 23 Cal.App.4th 748, 754 [29 Cal.Rptr.2d 177].) "The appellate court's objective in construing contractual language is to determine and effectuate the intention of the parties. [Citation.] 'It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce. [Citation.]' [Citation.]" (*Id.* at p. 755.)

We conclude the releases signed by C&F in the Virrissimo professional negligence action and by M&F in the Alves professional negligence action are ambiguous on the issue of whether respondents intended at the time of execution (see Civ. Code, § 1636) to release the broker fees each paid appellants for nonadmitted coverage. Given our decision *post* to remand this case, we decline to decide this issue here.

### B. *Statute of Limitations*

Appellants next argue the trial court erred when it ruled the "delayed discovery rule" applies to UCL claims. Both parties agree the applicable statute of limitations for a section 17200 et seq. claim is found in section 17208. This statute provides in part: "Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued."

Respondents in the instant case filed their lawsuit on March 10, 2004. Applying the four-year limitations period, appellants argued below and in this proceeding that restitution for any violation of the UCL before March 10, 2000, is time-barred. The trial court, however, found the statute of limitations

under section 17208 commenced when respondents first learned appellants lacked the special lines' surplus lines license in November 2001 in connection with an unrelated lawsuit. The trial court thus rejected appellants' statute of limitations defense.

■ The general rule in California is that a "statute of limitations begins to run when a cause of action accrues, even though the plaintiff is ignorant of the cause of action or of the identity of the wrongdoer." (*Community Cause v. Boatwright* (1981) 124 Cal.App.3d 888, 898 [177 Cal.Rptr. 657].) ■ The Courts of Appeal are split as to whether the delayed discovery rule applies to a claim brought under section 17200 and our Supreme Court, while noting the conflict, has yet to resolve the matter. (See *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 634, fn. 7 [54 Cal.Rptr.3d 735, 151 P.3d 1151] [comparing *Snapp & Associates Ins. Services, Inc. v. Robertson* (2002) 96 Cal.App.4th 884, 891 [117 Cal.Rptr.2d 331] (*Snapp*) (maj. opn. of Benke, Acting P. J.) [discovery rule does not apply] with *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1295 [119 Cal.Rptr.2d 190] [delayed discovery rule "probably" applies to unfair competition claims based on alleged nondisclosure of material information regarding vanishing premium policies]].)

Although resolution of a statute of limitations defense typically is a question of fact, when the facts are susceptible of only one legitimate inference a reviewing court may determine the issue as a matter of law. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 [245 Cal.Rptr. 658, 751 P.2d 923]; see also *Snapp, supra*, 96 Cal.App.4th at pp. 889–890.) We independently review the propriety of the court's ruling. (*Frankel v. Kizer* (1993) 21 Cal.App.4th 743, 749 [26 Cal.Rptr.2d 268].)

We conclude the delayed discovery rule does not apply to respondents' UCL claim because that claim, as we have now determined, is premised on appellants' violation of Insurance Code section 1764.1.[22] Unlike some situations where an unfair competition claim is premised on, among other things, fraudulent or deceptive conduct (see, e.g., *Broberg v. The Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 920–921 [90 Cal.Rptr.3d 225]) or where the injury, for example, is "silent and insidious" (*Warrington v. Charles Pfizer & Co.* (1969) 274 Cal.App.2d 564, 569–570 [80 Cal.Rptr. 130]), in the instant case respondents' claims going forward are based on appellants' failure to provide one or more disclosure statements required by Insurance Code section 1764.1. Given that the disclosure statements were due no later than "at the time of accepting an application for an insurance

---

[22] Because the basis for respondents' award of restitution, if any, is premised on a violation of section 1764.1 and not on section 1760.5, we do not address in this decision whether the delayed discovery rule would apply to a UCL claim premised on a violation of section 1760.5.

policy . . . issued by a nonadmitted insurer" (Ins. Code, § 1764.1, subd. (a)(1)), and that respondents therefore knew, or should have known, *then* that they did not receive what they were entitled to receive under the statute, we conclude the delayed discovery rule is not applicable here.[23] Thus, we conclude that respondents are barred from recovering restitution of any broker fees based on a violation of Insurance Code section 1764.1 occurring *before* March 10, 2000.[24]

## C. *B&B's Motion for Nonsuit*

Appellant B&B, the parent company of B&B Washington, argues the trial court erred in denying its motion for nonsuit because there was no evidence that Edmondson was employed by B&B, that B&B was in an agency relationship with the other appellants and that B&B did anything wrong in connection with respondents' UCL claim.

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his [or her] favor." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].) "A motion for nonsuit . . . concedes the truth of the facts proved, but denies as a matter of law that they sustain the plaintiff's case. A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor. [Citations.]" (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27–28 [61 Cal.Rptr.2d 518].) Because motions for nonsuit raise issues of law (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1542 [50 Cal.Rptr.2d 395]), "we review the rulings on those motions de novo, employing the same standard which governs the trial court [citation]." (*Id.* at pp. 1541–1542.)

---

[23] Respondents repeatedly argue that the applicable statute of limitations was tolled from 1996 to 2003 based on appellants' fraudulent concealment of their "illegal, unfair and fraudulent business practices." We note, however, that the trial court did not make any finding that appellants engaged in any fraud or fraudulent concealment, and that in any event there was no concealment with respect to the disclosure statements required under Insurance Code section 1764.1.

[24] Appellants also argue respondents are estopped from claiming entitlement to restoration of any commissions they paid on or after 2001 because the SOD provides respondents knew in 2001 that appellants lacked the special lines' surplus lines license required by Insurance Code section 1760.5 to place nonadmitted coverage. Respondents counter they did not discover appellants lacked the proper license until September 2003. However, given our decision that respondents' entitlement, if any, to restitution of commissions/broker fees for nonadmitted coverage is based on a violation of Insurance Code section 1764.1 and not on Insurance Code section 1760.5, we decline to resolve the estoppel issue.

The trial court's SOD found the evidence supports the findings that "all [appellants] (1) participated in the illegal conduct herein; and (2) were in an agency relationship with one another."

In "support" of these findings, respondents in their brief argue B&B was involved in any agency relationship because there was "no evidence that parent B&B, Inc., was *not* an agent of its wholly owned subsidiaries or the underwriters . . . [n]or was there any evidence that any of the [appellants] were *not* willing participants[] in the illegal sale of coverage into California as a single enterprise." (Italics added.)

Respondents, however, have it backwards; it was not appellants' burden to proffer evidence to show there was no agency relationship between B&B and B&B Washington or the other appellants, or that B&B was not a willing participant in the unlawful conduct, but rather it was respondents' burden to establish such findings based on the evidence. (See *J. M. Wildman, Inc. v. Stults* (1959) 176 Cal.App.2d 670, 674 [1 Cal.Rptr. 651].) Respondents provide no factual support in their brief for the trial court's findings, and we decline to read the voluminous record in search of such evidence, if it even exists. (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545 [35 Cal.Rptr.2d 574] ["We are not required to search the record to ascertain whether it contains support for [respondents'] contentions."]; *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 229 [220 Cal.Rptr. 712] [when no record references are made, a court of review may treat a point or issue as waived].)

Perhaps acknowledging, albeit tacitly, that there is no evidence of an agency relationship between B&B and the remaining appellants, respondents in reliance on *Troyk, supra,* 171 Cal.App.4th 1305 argue the trial court was entitled to "infer" appellants acted as a "single enterprise" in connection with respondents' UCL claim. We disagree with respondents' "reading" of *Troyk,* inasmuch as in that case there was an *express* finding that the various corporate entities acted as a single enterprise. (171 Cal.App.4th at p. 1342.) In the instant case, the trial court made no such finding, nor have respondents proffered any evidence to support such a finding.

We thus conclude the trial court should have granted B&B's motion for nonsuit.

## II

### *Cross-appeal*

#### A. *Respondents' Requests for Leave to Amend*

In their cross-appeal, respondents claim the trial court erred when it denied their two motions for leave to amend their complaint to add additional parties to their action.

#### 1. *Governing Law*

"The court may, in furtherance of justice, and on any terms as may be proper, allow a party to amend any pleading or proceeding by adding or striking out the name of any party . . . ." (Code Civ. Proc., § 473, subd. (a)(1).) " 'Leave to amend a complaint is thus entrusted to the sound discretion of the trial court. ". . . The exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse. *More importantly, the discretion to be exercised is that of the trial court, not that of the reviewing court*. Thus, even if the reviewing court might have ruled otherwise in the first instance, the trial court's order will . . . not be reversed unless, as a matter of law, it is not supported by the record." ' [Citations.]" (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242 [46 Cal.Rptr.3d 66, 138 P.3d 214].)

 Although pleadings may be amended at any stage of the litigation (*Moss Estate Co. v. Adler* (1953) 41 Cal.2d 581, 585–586 [261 P.2d 732]; *Record v. Reason* (1999) 73 Cal.App.4th 472, 486 [86 Cal.Rptr.2d 547]), if a party seeking amendment has been dilatory and/or the delay has prejudiced or will prejudice the opposing party, the trial court in its discretion may deny leave to amend. (See *Solit v. Tokai Bank* (1999) 68 Cal.App.4th 1435, 1448 [81 Cal.Rptr.2d 243].)

As we noted *ante*, respondents filed their "representative action"[25] before passage of Proposition 64. With its passage, persons who wanted to pursue representative claims were required to meet the standing requirements under section 17204 and comply with the requirements for class certification as provided in Code of Civil Procedure section 382. (*Mervyn's, supra*, 39 Cal.4th at p. 233.)

---

[25] "A 'representative action' is an action that is not certified as a class action in which a private person is the plaintiff and seeks . . . restitution on behalf of persons other than or in addition to the plaintiff." (*Shersher v. Superior Court, supra*, 154 Cal.App.4th at p. 1495, fn. 3.) We note that respondents did not seek to certify a class action in the instant case.

## 2. Brief Additional Background

Here, respondents moved in July 2008 to amend their complaint to add, among other changes, 166 new parties to their existing section 17200 cause of action, split roughly between new plaintiffs and so-called "nominal defendants." Respondents in their motion claimed any delay by them in moving to amend was directly attributable both to the lengthy delay by appellants in producing documents in written and electronic format, which delay resulted in sanctions against appellants of about $166,400,[26] and to respondents' efforts to contact the proposed new parties once they came into possession of such information.

In opposing the motion to amend, appellants argued respondents waited more than a year after they obtained the necessary information from appellants to move to add the 166 new parties and that if the motion was granted, they would be substantially prejudiced because trial was just four months away and appellants needed to depose each of the new proposed plaintiffs and conduct other discovery from them.

The trial court in September 2008 denied respondents' motion to amend. In so doing, the trial court found that "[g]iven the rapidly approaching trial date and potential five year problem [(based on the cutoff to bring a case to trial, as provided in Code of Civil Procedure section 583.310)], the Court finds such amendment not proper at this time." The trial court's ruling was without prejudice to the prospective new parties "bringing their own complaints against [appellants], if proper."

In mid-December 2008 respondents filed a second motion for leave to amend, this time under the guise of a "motion in limine to amend complaint to conform to proof." In this second motion, respondents sought permission to add anywhere between 44 and 54 new plaintiffs to their section 17200 claim. Appellants again opposed that motion and filed an opposing motion seeking to bar the introduction of evidence at trial of any UCL claims asserted by respondents in their "representative" capacity.

With trial of the case scheduled to start on January 30, 2009, the trial court on January 22, 2009, denied respondents' second motion to add additional plaintiffs and granted appellants' motion precluding respondents from pursuing representative claims under the UCL. In its ruling, the trial court noted respondents appear to have conceded that their action "does not meet the requirement under [section] 17203 of being able to comply with [Code of Civil Procedure section] 382, the class action statute."

---

[26] Appellants have not appealed the sanctions award.

"Without reaching the issue of whether equitable estoppel would defeat any statute of limitations defense" raised by appellants, the trial court found "amendment at this point to be extremely prejudicial to [appellants], especially given the fact that this case must proceed to trial by March of 2009. Moreover, the Court notes that if equitable estoppel did apply to toll any limitations period, presumably [respondents] could raise that argument in any new action filed by the proposed plaintiffs. However, in this action, the request for amendment is untimely and prejudicial."

### 3. *Analysis*

We conclude the trial court properly exercised its discretion when it denied respondents' motions to amend to add additional parties in this action. The record shows the trial court considered the timing of the motions and whether appellants would be prejudiced if respondents were allowed to amend. In denying the motions, the trial court noted the proposed new plaintiffs could file a separate action and pursue their claims in that action, as opposed to adding new parties to the current action where the trial date was rapidly approaching as was the mandatory five-year cutoff for the case to be tried. (See Code Civ. Proc., § 583.310 ["[a]n action shall be brought to trial within five years after the action is commenced against the defendant."]; *id.*, § 583.360, subd. (a) [if an action is not brought to trial within five years after it was commenced, it must be "dismissed"].)

Although the parties blame each other for the timing of respondents' two motions to amend, the trial court was in the best position to weigh the relative merits of the motions and ultimately decide whether to grant or deny amendment.

The record provides ample support for the trial court's finding that allowing respondents to add dozens of new parties to their action at that stage of the proceeding would have been "extremely prejudicial" to appellants. It shows that respondents were seeking restitution from appellants for premiums and commissions from at least 153 policies of insurance placed by appellants over a seven-or eight-year period; that *each* of the new proposed plaintiffs that respondents sought to add to the lawsuit would have been pursuing his or her own separate claim for restitution over a similar period of time based on policies placed by appellants, inasmuch as respondents did not attempt to certify a class action asserting such claims; that if added to the lawsuit, appellants would have had the right to depose *each* of these additional plaintiffs and conduct other discovery to determine whether the policies

placed—which could have numbered in the hundreds for *each* new party as it did for respondents here—were from admitted or nonadmitted carriers and based on that determination, whether any of the policies failed to pay any claims submitted by or on behalf of the new proposed plaintiffs and if so, whether the new proposed plaintiffs sustained losses or damages attributable to appellants; and that a trial involving so many plaintiffs under these circumstances would have been long and complicated and perhaps extended beyond the five-year cutoff provided in Code of Civil Procedure section 583.310.

Based on this record, we conclude the trial court's decision to deny respondents' motions to amend was reasonable and not an abuse of discretion, much less a "manifest or gross abuse of discretion" that is necessary for reversal. (*Arthur L. Sachs, Inc. v. City of Oceanside* (1984) 151 Cal.App.3d 315, 319 [198 Cal.Rptr. 483], italics omitted; see *Nelson v. Specialty Records, Inc.* (1970) 11 Cal.App.3d 126, 139 [89 Cal.Rptr. 540] [denial of leave to amend is proper when the proposed amendment "may require further investigation or discovery procedures"].)[27]

### B. *Prejudgment Interest*

Finally, respondents claim the trial court erred in refusing to award them prejudgment interest after finding they were entitled to $3.5 million in restitution.

Briefly, respondents' motion for prejudgment interest was decided on December 11, 2009, after the SOD was issued and after the parties had each filed an appeal to the judgment. The trial court denied respondents' request, ruling: "[Respondents'] motion for prejudgment interest is denied as the Court does not believe prejudgment interest appropriate in this case."

Respondents filed a motion for new trial and/or new judgment in late December 2009 in connection with the trial court's denial of prejudgment interest. Respondents aggressively argued they were entitled to prejudgment interest as the prevailing parties because to conclude otherwise, as the trial court had done, would "condone the [appellants'] 13 year[s'] fraudulent withholding of [respondents'] $3.5 million" and allow appellants to keep $5.5 million they made in interest.

---

[27] We reject respondents' alternative argument that the trial court abused its discretion in denying them leave to amend because the new parties could have been added as "nominal defendants" pursuant to Code of Civil Procedure section 382. This statute has no application here because the nominal defendants that respondents sought to add were not parties "necessary" to the action. (See Code Civ. Proc., § 389.)

The trial court in February 2010 found respondents' motion for new trial improper and untimely. The court nonetheless stated that if it reached the merits of the motion, it would deny it.

 Initially, we note that the UCL does not authorize an award of prejudgment interest. Respondents rely on a series of statutes in arguing such an award is proper, including on Civil Code sections 2224, 3287, subdivision (a), 3288 and 3302. None support respondents' statutory entitlement to recover prejudgment interest.

 Civil Code section 2224 addresses when a person is deemed to be an "involuntary trustee" and has nothing to do with prejudgment interest.[28] Civil Code section 3287, subdivision (a) also is inapplicable because it governs recovery of *damages*. It provides in part: "Every person who is entitled to recover *damages* certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ." (Italics added.) As we noted *ante*, under the UCL a plaintiff is entitled to injunctive relief and restitution, but *not* damages. (See *Korea Supply, supra*, 29 Cal.4th at p. 1144; see also *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 179 [83 Cal.Rptr.2d 548, 973 P.2d 527].)

Respondents' reliance on Civil Code section 3288 is likewise misplaced. This statute applies to "an action for the breach of an obligation not arising from contract," such as a tort claim. (See *Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814, fn. 16 [148 Cal.Rptr. 22, 582 P.2d 109] [under Civ. Code, § 3288, an award of prejudgment interest on a tort claim is committed to the sound discretion of the trial court].)

For many of the same reasons, we reject respondents' argument that Civil Code section 3302 authorizes them to recover prejudgment interest inasmuch as this statute governs *damages* available in a breach of contract action involving "breach of an obligation to pay money only . . . ." (See *Korea Supply, supra*, 29 Cal.4th at p. 1150 [actions under the UCL are not meant to be substitutes for tort or contract actions, but "[i]nstead [the UCL] provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices."].)

Respondents also rely on Probate Code section 16441 and Insurance Code section 1733 to support their statutory right to recover prejudgment interest.

---

[28] Civil Code section 2224 provides: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

Neither statute authorizes an award of prejudgment interest on a UCL claim. Probate Code section 16441, subdivision (a) provides that a trustee liable for breach of trust (as provided in Prob. Code, § 16440) is also liable for the amount of interest that accrues at the legal rate on judgments or the amount of interest actually received, whichever amount is greater. Clearly, appellants in the instant action were not liable as trustees or for breach of trust.

Insurance Code section 1733 also does not apply to respondents' UCL claim because this statute requires persons who receive funds "as premium or return premium on or under any policy of insurance or undertaking of bail" to hold them "in his or her fiduciary capacity" and states that any person who diverts such funds shall be "guilty of theft and punishable for theft as provided by law." (Ins. Code, § 1733.)[29]

Lastly, we reject respondents' argument that they are entitled to an award of prejudgment interest based on Code of Civil Procedure sections 1032 and 1033.5, subdivision (a)(14). Subdivision (a)(14) of Code of Civil Procedure section 1033.5 provides that an award of "costs" pursuant to Code of Civil Procedure section 1032 includes "Any other item that is required to be awarded to the prevailing party *pursuant to statute* as an incident to prevailing in the action at trial or on appeal." (Italics added.) Because respondents are not entitled to a statutory award of prejudgment interest in connection with their UCL claim, we conclude subdivision (a)(14) of Code of Civil Procedure section 1033.5 is inapplicable here.

For the benefit of the parties on remand, we conclude respondents' entitlement to prejudgment interest, if at all, is subject to the discretion of the trial court inasmuch as no statute or contract authorizes such recovery under the facts of this case. *If* on remand the trial court in the exercise of its discretion awards respondents' prejudgment interest, that award must be based on broker fees (but not premiums) paid by respondents for nonadmitted coverage on or after March 10, 2000, as we explained *ante.* Of course, respondents' entitlement to the return of broker fees also depends on whether one or both of them released such claims in their respective settlement agreements with appellants in connection with their professional negligence actions against these same appellants.

---

[29] To the extent respondents are arguing appellants are liable for breach of fiduciary duty, respondents each asserted such a claim in their respective professional negligence actions against appellants and thus released those claims, among others, in connection with their respective settlements of those actions.

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings not inconsistent with this opinion. Appellants to recover their costs of appeal.

McDonald, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied February 23, 2012, and respondents' petition for review by the Supreme Court was denied May 9, 2012, S200751.