Filed 9/16/15  Albillo v. Ports O'Call Restaurant Corp. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| OSCAR ALBILLO et al., | B257293 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. NC044391) |
| v. | |
| PORTS O'CALL RESTAURANT CORPORATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge.  Affirmed.

Blumberg Law Corporation, Ave Buchwald and John P. Blumberg for Plaintiffs and Appellants.

Bremer Whyte Brown & O'Meara, Joshua D. Bordin-Wosk; Law Office of Priscilla Slocum and Priscilla Slocum for Defendant and Respondent.

This appeal arises from a nonsuit in favor of respondent Ports O'Call Restaurant Corporation (POC) in a slip and fall action brought by appellants Oscar and Blanca Albillo (the Albillos[1]). Oscar Albillo's fall occurred at the Asian Entry Statement, which provided access into the Pan Pacific Village portion of the Ports O'Call Village in San Pedro. POC leased the property from the City of Los Angeles; it was later subleased or assigned to a series of entities, the last of which were subtenants Sam and Sung Cho (the Chos). The Albillos named only POC as a defendant; the Chos were not named. The primary issue on appeal is whether the trial court erred by granting POC's motion for nonsuit based on its determination that 1) the Chos, not POC, had possession and control over the location where Oscar fell; and 2) the Albillos therefore were required to prove that POC had actual notice of the dangerous condition that caused Oscar's fall as part of their case-in-chief.

In addition to raising this legal issue, the Albillos also contend that the court erred in granting the nonsuit based on testimony and documentary evidence that was not placed before the jury in their case-in-chief. Instead, the trial court recessed the trial and heard additional evidence outside the presence of the jury on the issue of possession and control, as well as the standard of duty applicable to POC.

Given the unusual procedural posture of this case, we find the court did not err in considering the additional evidence relating to the legal issue of POC's duty during the hearing on the motion for nonsuit. The issue of POC's duty of care was for the court, not the jury, to determine. We also conclude the trial court correctly determined that the Chos had possession and control of the location of Oscar's fall, which required the Albillos to prove that POC had actual notice of the dangerous condition. We further agree with the trial court's determination that the Albillos did not present evidence of POC's actual notice from which a reasonable jury could find in their favor. We therefore affirm the judgment.

---

[1] We sometimes refer to the Albillos by their first names for the sake of clarity. No disrespect is intended.

2

## FACTUAL AND PROCEDURAL SUMMARY

A.    *The Premises*

In 1976, the City of Los Angeles (City) leased vacant land to POC in the San Pedro Harbor.  The leased premises run from the water on the east side to Nagoya Way, a City street, on the west.  The Master Lease defined the "Demised Premises" by enumerated parcels, including those relevant to this appeal (parcels 13 and 21A), as depicted on a Harbor Map attached to the lease as Exhibit A (hereafter "Exhibit A").  Section 7 of the Master Lease, which addresses use of the premises, states that "Parcels 21A, 21B, and 21C are to be used only for a pedestrian thoroughfare for access to and along the leased Premises."  POC was required to obtain the approval of the Board of Harbor Commissioners for any sublease or assignment of the premises.  The terms and conditions of the Master Lease were binding upon sublessees.  Under the terms of the Master Lease, POC constructed sidewalks and other improvements.

In 1992, POC subleased a portion of the leased property to ABC International, Inc. (ABC)  The Sublease described the "Demised Premises" as a 15,046 square foot area comprised of parcel numbers F-1, F-2, F-4, F-6, (F-7 (fishnet is excluded)), F-8, F-9 and F-10 and "cross hatched on Exhibit 'A', attached hereto, made part of this sublease, and hereinafter referred to as the 'Demised Premises/or Subleased Premises.'"  ABC was given reasonable, nonexclusive license to use all common areas, walkways and walking areas.  ABC agreed to be bound by all provisions of the Master Lease, which was incorporated into the Sublease.

Dennis Stahl, vice-president of POC, testified before the jury that in 1992, ABC developed a number of buildings known as Asian Village on the Demised Premises.  An "Asian Entry Statement" was built as the entrance to the Asian Village area on the west side of Ports O'Call Village, adjacent to Nagoya Way, a public street maintained by the City.  Photographic exhibits depict the Asian Entry Statement as a large gateway structure with a blue tile Asian-style roof supported by several large decorative columns.  The sidewalk of the entry to Asian Village consists of decorative tile borders in a pattern of squares.  The photographic exhibits show a number of poles or bollards spaced far

3

enough apart to allow pedestrian traffic to enter Asian Village, where the concrete sidewalk meets the asphalt roadway of Nagoya Way.  The bollards are painted bright yellow.  A stripe of red paint, applied by the City, runs along most of the frontage on Nagoya Way.  The roof of the Asian Entry Statement extends to the edge of the concrete where it meets the asphalt roadway of Nagoya Way.

Under the Sublease, ABC was to be "solely responsible" for the maintenance costs associated with the entire Demised Premises, including common areas.  Common areas were defined as including all leasable and common areas of the Demised Premises, including entries and walkways. POC had the right to enter the subleased premises "to do any act or thing which [POC] may be obligated to do pursuant to the bylaws, government regulation, the Master Lease or sublease or otherwise."  The Sublease expressly limited POC's responsibilities for maintenance and repair to maintaining and repairing foundations, exterior walls, roofs, gutters and downspouts on exterior walls and roofs, as well as sewers beyond the boundaries of the Demised Premises. [2]  ABC was responsible for all maintenance repairs to the Demised Premises except those reserved to POC.

POC and the City were expressly not to be held liable for, and were indemnified for, "any injury which may occur to . . . guests, invitees . . . of the Subleased Premises or any part thereof."  POC and City were not to be liable for any damage to persons caused by the maintenance or use of subleased premises and appurtenances thereof.  In addition, POC was "not [to] be liable for any latent or patent defect in the Demised Premises." According to Stahl, the City periodically resurfaced Nagoya Way between 1992 and 2010.

In 1993, ABC assigned the Sublease to 3T Marketing.  A First Amendment to the Sublease was executed in 1994.  The amendment changed the description of the Demised

---

[2] The sublease prohibited an expansion of POC's maintenance obligation: "Nothing in this paragraph shall be construed to impose upon [POC] any obligations to construct, maintain or make repairs, replacements, alterations or additions, nor shall it create any liability for any failure to do so, except to the extent as [POC] may have a duty to repair pursuant to this Sublease."

Premises, deleting the description in the Sublease and substituting specified parcel numbers and "all common areas of the 'Asian Village' as cross-hatched on Exhibit 'A' attached hereto, and made part of this sublease."[3] The Demised Premises were described as consisting of approximately 15,046 square feet. Section 15C of the Sublease delineating POC's repair responsibilities was deleted and replaced by language stating that POC was to maintain and repair foundations and sewers located beyond the boundaries of the Demised Premises with specified exceptions.[4]

A Second Amendment to the Sublease was agreed to in 1995, but it did not change the description of the Demised Premises.[5] Pursuant to the Second Amendment, Asian Village was renamed Pan Pacific Village. In 1995, 3T Marketing assigned the Sublease to the Chos.

B.    *The Complaint*

Oscar and Blanca filed their complaint for negligence and loss of consortium against POC in March 2012. They alleged that POC negligently allowed a dangerous elevated separation between Nagoya Way and the sidewalk in front of the Pan Pacific Village. They further alleged that in May 2010, Oscar tripped on that elevation and fell

---

[3] The definition of Demised Premises in the First Amendment to the Sublease provides: "A. [POC] hereby subleases to [3T Marketing], and [3T Marketing] hereby subleases from [POC], all of that certain real property identified as Parcel Numbers F-1, F-2, F-4, F-6, F-7, F-8,F-9, F-10, *and all common areas of the 'Asian Village' as cross-hatched on Exhibit 'A' attached hereto, and made a part of this SUBLEASE.*" (Italics added.)

[4] POC's repair responsibilities were redefined: "[POC] shall maintain and repair the foundations and sewers located beyond the boundaries of the Demised Premises, unless damage to said foundations or sewers have [sic] been caused by any act of negligence of [3T Marketing] or of [3T Marketing's] employees, agents, invitees, licensees, or contacts. For example, grease causing sewer blockage would be the responsibility of the offending restaurant or subtenant."

[5] The Second Amendment revised the rent formula and stated that the subleased premises were to be used for the installation and operation of Asian retail stores and Asian restaurants.

forward, striking his head and sustaining injuries. Blanca sought damages for loss of consortium. The only named defendant was POC. POC answered the complaint. The Albillos filed a first amended complaint substituting a bankruptcy trustee for Blanca.[6] POC filed an answer to that complaint, and later filed a motion for summary judgment, which was denied. (The summary judgment pleadings are not included in the record on appeal.)

C.     *Motions in Limine*

Trial was set for February 24, 2014. That day, the trial court took up 12 motions in limine filed by the parties. The only motions relevant to the issues in this appeal are the Albillos' motion number 1 and POC's motion number 3, both of which raised POC's duty of care and any liability by a sublessee.[7]

The trial court heard extensive argument on the two motions. It focused on the terms of the sublease to the Chos and whether they, rather than POC, had possession and control over the location of the fall. On February 24, 2014, the first day of hearings on the motions in limine, the trial court asked counsel for the Albillos whether he was arguing for exclusion of testimony about what the leases were, who leased what, their understanding of the boundary lines, and who has a right to possession. The court asked "They [POC] can put on all of that evidence, right?" Counsel for the Albillos responded "As fars [*sic*] as you've said it, yes."

POC filed a supplemental brief on these issues on February 27. At the hearing that day, the court acknowledged a legal issue as to the terms of the lease documents.

---

[6] The bankruptcy trustee abandoned the estate's claim against POC while this appeal was pending. We granted Blanca's request to be substituted in place of the bankruptcy trustee.

[7] The Albillos' motion referenced POC's argument in its motion for summary judgment that it was not liable because the sublessee had responsibility for maintaining the sidewalk. POC's opposition to the Albillos' first motion in limine stated that the Albillos would contend at trial that the condition that caused the incident was on premises leased by POC but not subleased to the Chos.

6

The court noted the general principle that a landlord who has leased the property to a tenant has no duty of care to a guest of the tenant unless the landlord has actual knowledge of the dangerous condition that caused injury and the right and ability to cure it. (*Stone v. Center Trust Retail Properties, Inc.* (2008) 163 Cal.App.4th 608 (*Stone*).) The court asked why *Stone* should not apply if it was true that POC gave up possession of the property, as the court's reading of the supplemental brief suggested. In that situation, the court said the Albillos would have to show actual notice to establish that POC had a duty of care. Counsel for both parties agreed with the court's suggestion that a jury be picked and the issue resolved the next day.

On February 28, 2014, POC filed another supplemental brief setting out the chronology of the lease and subleases, including the eventual assignment to the Chos, with all supporting documents attached as exhibits. These included the Sublease to ABC (marked as defense trial exhibit 102); the First Amendment to the Sublease (marked as defense trial exhibit 103); and the assignment to the Chos (marked as defense trial exhibit 108).

At the start of proceedings on February 28, the trial court again raised the issue of the sublease with the Chos. The court read from a portion of the February 28, 2014 supplemental defense brief describing the common areas as defined in the First Amendment to the Sublease, which include the ingress and egress easement identified as Parcel 21A on the original lease map. The court heard further argument regarding whether an easement over Parcel 21A was included in the subleased premises. The court indicated that Parcel 21A, where the fall occurred, remained a common area, and within the definition of Demised Premises subleased to the Chos. Once again, the court asked counsel for the Albillos why the rule in *Stone*, *supra*, 163 Cal.App.4th 608 should not apply, requiring actual notice of a dangerous condition and a right to repair it in order to impose a duty of care on a landlord out of possession of the property.

The parties then argued whether POC had the obligation to enter onto the Demised Premises for maintenance purposes. The trial court said "I can't believe you guys waited. Bring in the jurors." After a lunch recess, trial began with the Albillos' case-in-chief.

7

It is unclear whether the trial court ruled that the *Stone* standard applied at this stage. The court stated that it had so ruled. The record itself is not clear on this point.[8] It is clear, however, that the trial court ruled that *Stone* applied in granting the motion for nonsuit, discussed below.

### D. *The Trial*

The trial court bifurcated the liability and damage issues for trial. The following facts were adduced during the liability phase. On May 8, 2010, Oscar, his nephew, Jose Diaz, and their friend Beder Antonio Lopez[9], went to the San Pedro Fish Market at Ports O'Call Village for lunch. Over the next four hours, in addition to ordering food, Oscar and Lopez drank two to three pitchers of beer. Oscar decided to leave and called his son, Osmar Albillo, to pick him up because he had been drinking.

Diaz testified that while they were waiting for their ride, he, Oscar and Lopez walked toward another restaurant at Ports O'Call Village. He was walking about two feet ahead of Oscar. Diaz testified that Oscar was walking slowly but seemed to be in control of his body. Diaz walked past one of the yellow bollards to enter Pan Pacific Village and turned right. He heard a noise, turned, and saw Oscar on the ground, unconscious.[10] Diaz testified that exhibit 117, a photograph of the area he was shown at his deposition, showed where Oscar fell. Trial exhibit 7-020 accurately depicted what the ground looked like at the time.

---

[8] POC's counsel asked Dennis Stahl, the person most knowledgeable about the subleases, about the subleases in the case-in-chief. The trial court interjected "Why are we doing this? I ruled on the issue of the standard. What's the relevance of it?" Counsel for POC replied that counsel for the Albillos appeared to be intimating that POC had responsibilities under the Master Lease. The trial court responded: "Doesn't matter what the inference is. What matters is [the] instruction I give to the jury as to the standard of care as for this part. [¶] Next time object."

[9] Lopez did not testify at trial.

[10] In their opening brief, the Albillos concede that Diaz's testimony about Oscar's position on the ground was "not sufficiently described in the record to be meaningful."

Oscar's son, Osmar, pulled up in front of Pan Pacific Village and saw his father lying on the ground. Oscar "was laying [*sic*] with his feet toward the asphalt, head toward the restaurant [which was inside the Village]." Osmar returned to the scene about two weeks later. He testified that exhibits 7-010 through 7-020 accurately depicted the area of the fall as it appeared on his second visit in 2010.

Oscar testified, but he had no recollection of his fall. Blanca testified that since the accident, Oscar had experienced loss of memories, loss of the ability to speak English clearly and fluently, and difficulty communicating.

The exact location of Oscar's fall was disputed at trial. In reviewing a nonsuit, we must take the plaintiffs' evidence as true, and disregard conflicting evidence. (*M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1532 (*M&F Fishing*).) Under this standard, for purposes of this appeal, we will assume the truth of testimony by Diaz and Osmar Albillo that Oscar fell between the two bollards to the right when viewed from the street where the concrete met the asphalt roadway and red stripe as shown in the photographs marked as Exhibit 7. The evidence at trial focused on this location.

The Albillos' surveying expert, Danny May, testified that he surveyed the boundary between the property leased to POC and Nagoya Way. He determined that the boundary was not where the concrete sidewalk abutted the asphalt of the roadway (under the Asian Entry Statement in the red striped area). Instead, the boundary was seven inches from the edge of the sidewalk to the west, which was in the asphalt road surface of Nagoya Way.[11]

Dennis Stahl testified in the Albillos' case-in-chief. His affiliation with POC began in 2003. He is the person at POC most familiar with the terms of the original lease. At the time of the original lease, Parcel 21A, a narrow strip of land adjacent to Nagoya Way, and other parcels, were designated for use as a pedestrian thoroughfare for

_____

[11] Photographs taken during May's survey were admitted as Exhibits 5-001 through 5-006.

access to the premises. POC had agreed under the Master Lease to maintain all improvements covered by that agreement.

Stahl testified on direct that he visits Ports O'Call Village two to four times a year. He parks in the parking lot on Nagoya Way and enters the village through various areas. If he intends to go toward the Pan Pacific Village, he enters through the Asian Entry Statement. He visits the area in front of Pan Pacific Village once or twice a year. On cross-examination, Stahl said "POC" walks the Ports O'Call Village property four to five times a year, but he did not specify the person who performed those visits. POC does not have an office at the Village property.

When ABC built the Asian Entry Statement in 1992, the whole entry area was redone, including the sidewalk. Stahl was not aware of any work other than normal maintenance performed by the subtenant in the area of the sidewalk and the boundary in front of Pan Pacific Village between the time of the 1992 work and 2010.

Stahl was shown exhibit 7-013, a photograph of the area where Oscar Albillo fell. It depicts the right side of the Asian Entry Statement viewed from the street with the two bollards to the far right and the concrete sidewalk abutting the asphalt roadway and red striped area. Stahl did not recall any noticeable change to that location between 2010 and 2012, when the photographs in exhibit 7 were taken. He first heard about Oscar's fall when served with the complaint in March 2012.

Stahl testified that POC built a sidewalk in 2004 at the request of the Chos, who paid POC for the work.[12] This was on the north side of Pan Pacific Village, an entirely different area than the location of the fall. Stahl testified that if POC receives a complaint about needed repairs, it investigates the site and sends a notice to the subtenant responsible for that area. No requests for repair of the area in front of Pan Pacific Village had been received.

Brad Avrit also testified for the Albillos. He is a civil engineer and expert on pedestrian safety, the biomechanics of walking, and human factors, which encompasses

---

[12] The work was contracted through POC's parent entity, Specialty Restaurant Corporation.

10

how people interact with the environment around them. Avrit personally investigated the site of Oscar's fall. The company took the series of photographs marked as Exhibit 6-001 through 6-013 in 2012. Avrit's opinion was that the walking surface at the location of Oscar's fall, as shown in exhibit 6-001, was not in a reasonably safe condition. It was dangerous because there was a significant tripping hazard caused by a height differential in the red stripe between the concrete walkway and the asphalt. Although the differential was high enough to trip a pedestrian, it was low enough to be difficult to perceive, and therefore was not obvious. In addition, exhibit 6-003 showed various conditions distracting to pedestrians, including two-way vehicle traffic, advertising displays and signs, and bollards protruding from the ground. He testified that pedestrians turning the corner into Pan Pacific Village encountered shops and restaurants that would cause them to look away from the walking surface. In Avrit's opinion, the condition of the property created a significant risk of tripping.

Based on evidence of this significant trip hazard, and the position in which Oscar was found on the ground, Avrit opined that the incident was consistent with a person tripping and losing his balance, resulting in a fall. In his opinion, the photographs in exhibit 6 depict a long-standing depression that evolved over a significant length of time rather than suddenly.

The Albillos' exhibits were admitted and they rested.

E.      *The Nonsuit Motion*

POC moved for nonsuit on March 4. The trial court was presented with a unique situation. It recognized that the legal issues of interpretation of the sublease documents and POC's duty were questions of law for its determination, not the jury's. Although the Albillos had not introduced evidence of any sublease from POC in their case-in-chief, the court was aware of the subleases because of the extensive argument and evidence presented in the motions in limine. The court concluded that it was necessary to take additional evidence to assist in its legal determinations. The court did not take new evidence on any factual issue to be decided by the jury.

11

The court examined Exhibit 103[13], the First Amendment to the Sublease. The common areas of the Demised Premises are defined by reference to the cross-hatched area on Exhibit A to the First Amendment. The trial court observed that Exhibit A "isn't at all clear." It said that while some cross-hatches appeared to cross both Parcels 13 and 21A, others did not. The trial court asked counsel for the Albillos about the language of the sublease that said "all common areas" were included in the definition of the Demised Premises. Counsel made reference to common areas within Parcel 13.

At that point, the court announced that it was going to recess the trial, and call the person most knowledgeable about the lease as a witness. Counsel for POC identified Dennis Stahl, who had testified in the Albillos' case-in-chief, as that person. Counsel for the Albillos objected that Stahl had not negotiated the lease. The trial court said it intended to ask Stahl and Mr. Cho[14] to testify about who was maintaining the property from Nagoya Way into the Pan Pacific Village. The court said: "Because if Mr. Cho is maintaining everything from Nagoya Way on, and has been since 1997, then I'm going to conclude that that was the lease [*sic*] premises in 1994." [¶] And I have to do that in order to decide what the standard of care is" and whether to grant the nonsuit motion.[15]

Counsel for the Albillos objected to taking new evidence on the nonsuit motion because the motion tests the evidence presented in plaintiff's case-in-chief. The trial court rejected plaintiffs' argument, stating "but I'm not offering evidence for the jury to hear. I'm trying to find out what standard I use to rule on a nonsuit: is it actual knowledge or knew or should have known. And if these premises are still possessed by Ports O'Call, then it's knew or should have known, and nonsuit denied. If it's in the

---

[13] This was a defense exhibit to POC's supplemental brief filed February 28, 2014 (see C, above at page 8). It had not been received into evidence.

[14] Mr. Cho did not in fact testify at the hearing.

[15] Before testimony was presented at the nonsuit hearing, the trial court elicited an agreement by counsel for the Albillos that if the site of the fall was subleased to the Chos, then the proper standard for a duty of care would be actual knowledge under the governing case law.

12

hands of the Chos and was, in fact, subleased to the Chos back in '97, then I think I have to grant the motion for nonsuit, because I don't think there is evidence of actual knowledge."

The nonsuit hearing resumed on March 5. The court stated it had ruled that the possessory interest was with the Chos, and therefore the Albillos had to prove POC had actual notice of the dangerous condition. But in light of the Albillos' argument that there was no evidence of the Chos' possessory interest, the court called Stahl to lay a foundation for the Sublease, the First Amendment to the Sublease, and the Second Amendment to the Sublease.

Stahl testified that the cross-hatched area on exhibit A to Exhibit 103 (First Amendment to the Sublease) includes both Parcels 13 and 21A. He testified that the roof of the Asian Entry Statement extends all the way to the public street line, across Parcel 21A.[16] Stahl testified that POC did not have possession of any of the property, including Pan Pacific Village. From boundary to boundary, the control was with the Chos as sublessee. He said POC's intent was to lease everything POC received from the City, from the westerly most portion of Parcel 21A all the way back to the water. The Chos were to maintain the entire property subleased to them. Their maintenance obligation ended at the legal property line for the property POC received from the City under the Master Lease. POC did not survey the property line. Stahl explained that the parties may have therefore been mistaken about the location of the boundary, but that they understood that it extended up to the asphalt.

Stahl further testified that section 1 of the First Amendment to the Sublease (Exhibit 103) made all common areas of the Asian Village cross-hatched on Exhibit A part of the subleased premises, "because he believe[d] the original Sublease was not clear in that fashion, on that particular point." The First Amendment therefore modified

---

[16] The court had reviewed the transcript of Stahl's testimony in the case-in-chief, in which he stated that ABC built the Asian Entry Statement under the terms of the original Sublease.

13

paragraph 7 of the original Sublease (Exhibit 102), which defined the common area as including all leaseable and common areas of the Demised Premises including walkways.

Following argument by counsel, the court issued its ruling. It interpreted the Sublease (exhibit 102) and the First Amendment to the Sublease (exhibit 103) and assignment (Exhibit 108) as subleasing all the property leased by POC to the Chos, including Parcel 21A, starting from the point where the concrete sidewalk abutted Nagoya Way. The court concluded that there was no other reasonable reading of the lease documents, amendments, and Stahl's undisputed testimony.

The court was not persuaded by the Albillos' argument that POC was liable because the contract gave it the ability to make repairs or direct the tenant to make repairs. It reasoned that the tenant's possession of the property required the landlord to have actual notice of a dangerous condition to impose a duty. It concluded that the Albillos were required to prove in their case-in-chief that POC had actual notice of the dangerous condition.

The court then considered the evidence of notice. It found that POC gave up possession of the site of Oscar's fall in July 1994 when the First Amendment to the Sublease was executed. Taking the evidence in the light most favorable to the plaintiffs, on the date of the fall in May 2010, the court found the property looked as it did in the photographs in evidence.[17]

The court noted that the Albillos had presented no evidence of when the condition was created, when it developed to the point depicted in the photographic exhibits, or when Stahl visited the property. The photographic exhibits established that the Asian Entry Statement is a large area, which allows entry between any of the bollards. There was no evidence that the defect was present when Stahl visited. Based on the state of the

_____

[17] There was no specific evidence as to when the dangerous condition developed. Avrit testified it had developed over a long period. He also admitted that he did not know what caused the dangerous condition.

14

evidence, the trial court concluded that it did not believe that the jury could find that the defendant had actual knowledge. On that basis, the court granted nonsuit.[18]

Judgment for POC was entered on April 9, 2014. The Albillos' motion for new trial was denied.

DISCUSSION

I

The Albillos' Procedural Challenges

We begin our analysis with the multiple procedural issues raised by the Albillos as to the nonsuit.

A.      *New Evidence at Nonsuit Hearing*

The Albillos' primary argument is that the trial court erred in ruling on the nonsuit motion by considering evidence, both documentary and testimentary, which had not been presented to the jury in the Albillos' case-in-chief. We conclude that the trial court did not err in considering this evidence, which was relevant to whether the Chos, rather than POC, were in possession of the location at the time of Oscar's fall.

This is not a situation where the Albillos were ambushed by an issue raised for the first time on nonsuit. We have reviewed the entire record on appeal, as required by the applicable standard of review. (*Fillpoint v Maas* (2012) 208 Cal.App.4th 1170, 1176 (*Fillpoint*) [appellate court cannot consider plaintiff's evidence in isolation, and disregard contradictory evidence, rather the entire record must be reviewed]; *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581 ["the appellate court's review must be based on the whole record, not just the excerpts chosen by the appellant"].) As we have discussed, the record on appeal demonstrates that the language and impact of the subleases was thoroughly addressed by the parties and the court before the Albillos presented their case-in-chief. The Albillos chose not to present evidence of the subleases

---

[18] The trial court therefore did not rule on the Albillos' argument that they had presented sufficient evidence that POC had constructive notice of the dangerous condition to overcome nonsuit.

15

in their case. Therefore, out of an abundance of caution, the court called Stahl to testify at the nonsuit hearing regarding the foundation for the sublease documents and the intent of the parties to transfer all the property received by POC, including the location of Oscar's fall, to the Chos.

This evidence was relevant to interpretation of the subleases. Contract interpretation is solely a judicial function, even on a nonsuit. (*Thrifty Payless, Inc. v. Mariners Mile Gateway* (2010) 185 Cal.App.4th 1050, 1060.) Stahl's testimony at the nonsuit hearing was uncontradicted regarding the intent of the parties as to the Chos' possession and control of the entire leased premises. "Where, as here, no conflicting parol evidence is introduced concerning the interpretation of the document, 'construction of the instrument is a question of law, and the appellate court will independently construe the writing. [Citation.]'" (*Paralift, Inc. v. Superior Court* (1993) 23 Cal.App.4th 748, 754.)" (*M&F Fishing*, *supra*, 202 Cal.App.4th at p. 1530.)

The second issue of law decided on the nonsuit motion was the applicable standard of duty of care POC owed to Oscar. The existence of duty is a question of law to be decided by the court. (*Lawrence v. La Jolla Beach and Tennis Club, Inc.* (2014) 231 Cal.App.4th 11, 22.) If POC was in possession and control of the location of the fall, the Albillos needed only to prove that POC had constructive knowledge or notice of the dangerous condition in order to give rise to a duty of care. If POC had transferred possession and control to the Chos, then the Albillos were required to prove that POC had actual knowledge of the dangerous condition to establish a duty of care to Oscar. (*Stone*, *supra*, 163 Cal.App.4th at p. 612; *Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504, 514 (*Uccello*) [where landlord is out of possession, duty of care arises only where landlord has actual knowledge of dangerous animal, coupled with a right to have it removed from premises].)

We have found no case directly on point with this unique procedural situation. However, *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327 (*R & B Auto*) is instructive. In *R & B Auto*, the Court of Appeal found that evidence submitted on a motion in limine could be considered on a nonsuit motion under the

16

peculiar circumstances presented. In that case, a used car dealer was sued under the "lemon law." [19] When its insurance carrier would not defend or indemnify the claim, the car dealer brought various claims against its carrier. The trial court eliminated the bulk of the car dealer's evidence through rulings on motions in limine, and then granted nonsuit before opening statements or presentation of evidence. (*Id*. at p. 333.)

The appellate court in *R & B Auto* acknowledged the general rule that an appellate court may not consider evidence which was not put before the trial court. But it concluded: "[T]his is not an instance in which the evidence we consider was never proffered to the trial court in any context. It is simply the case that [the dealer] did not take the time to remind the court of each of those individual items of evidence at the time it opposed the motions for nonsuit, considering that the court had largely gutted its case through rulings on motions in limine, and [the dealer] saw little basis for proceeding without reversals of those rulings. *Under the peculiar circumstances of this case, we see no reason, in assessing the parties' arguments on appeal, to ignore the evidence that had been raised in the trial court proceedings and is contained in the appellate record.*" (140 Cal.App.4th at p. 341, fn. 6, italics added.)

The court's holding in *Kim v. Konad USA Distribution, Inc.* (2014) 226 Cal.App.4th 1336 (*Kim*) is also relevant to considering the trial court's admission of evidence at the hearing on the nonsuit. In that case, the plaintiff brought sexual harassment and wrongful termination claims against her former employer and supervisor. Her complaint did not plead exhaustion of her administrative remedies with regard to her cause of action under the Fair Employment and Housing Act (FEHA, Gov. Code, § 12900 et seq.), although she had received a right to sue letter from the Department of Fair Employment and Housing which satisfied that requirement. Although they pleaded an affirmative defense of failure to exhaust administrative remedies, the defendants did not raise the issue by any pretrial motion. (*Id*. at p. 1342.) The defense opening statement at trial did not mention the failure to exhaust issue, and the record on appeal did not include

_____

[19] The Song-Beverly Consumer Warranty Act, Civil Code section 1790 et seq.

any motions during or after trial based on that issue. (*Ibid.*) During the plaintiff's examination at trial, defense counsel elicited her testimony that she had not filed any document with a government agency alleging sexual harassment. On redirect, over objection, plaintiff's counsel introduced the right to sue letter. (*Id*. at pp. 1342-1343.)

The defendants raised the failure to exhaust issue in objections to the trial court's proposed statement of decision and judgment in favor of plaintiff. Defendants moved to set aside the judgment on the ground of failure to exhaust administrative remedies and other grounds. Plaintiff opposed the motion, arguing the defendants had waived the issue. She attached copies of the verified administrative complaints she filed and a right to sue letter. (*Kim*, *supra*, 226 Cal.App.4th at p. 1344.) Taking a position similar to that taken by the Albillos here, the defendants in *Kim* argued that it was improper for the court to consider the documents attached to the plaintiff's opposition because they were not admitted at trial. (*Ibid.*) The court denied the motion, rejecting the defendants' arguments.

On appeal, the defendants renewed their argument that the court lacked jurisdiction to enter judgment because plaintiff had failed to prove exhaustion of her administrative remedies at trial. The appellate court recognized that it was unclear "what should happen if the issue of exhaustion of administrative remedies is basically ignored until after FEHA claims have been submitted to the fact finder for decision." (*Kim*, *supra*, 226 Cal.App.4th at p. 1346.) It reviewed the record and concluded that the "only reasonable inference" was that the plaintiff had exhausted her administrative remedies. (*Ibid.*) It observed "defendants' argument (implicitly at least) is that we are obligated to limit our review to evidence admitted at trial, thereby ignoring the fact that plaintiff really did exhaust her administrative remedies." (*Ibid.*) It affirmed the judgment for plaintiff.

The situation presented in this appeal is similar to the procedural status of *R & B Auto*, *supra*, 140 Cal.App.4th 327 and *Kim*, *supra*, 226 Cal.App.4th 1336. The court was presented with legal issues which could not be resolved based on the limited evidence presented in the Albillos' case-in-chief. The subleases had been submitted to the court before the case-in-chief began during litigation of the motions in limine.

18

The position taken by the Albillos on appeal is that the trial court should have ignored the sublease to the Chos, and allowed trial to proceed on the evidence presented in their case-in-chief that POC was in possession of the site of the fall under the Master Lease. These unusual circumstances are analogous to the defendants' effort to ignore the right to sue letter received by the plaintiff in *Kim*, *supra*, 226 Cal.App.4th 1336.

In addition, during argument on the motions in limine on February 24th, counsel for the Albillos stated he had no objection to POC's introduction of the evidence to which they now object on appeal.[20] The defense exhibits could have been identified and admitted that day based on that representation.

At the beginning of the hearing on the nonsuit motion, the trial court reminded counsel that the issue of the applicable duty is a matter of law for the court's determination. It observed that it had the subleases as well as the lease before it. When counsel for the Albillos objected that the subleases were not in evidence, the court stated: "Sir, I could admit them right now, not for the purposes of the jury, but for the purposes of the court deciding what duty is owed. And I have had testimony about exhibits 102 [sublease from POC to ABC] and 103 [First Amendment to Sublease], the sublease and the amendments to the sublease." The court went on to describe the chronology of the sublease, amendments and assignments. The court determined it could consider the evidence because it was deciding the duty issue, a legal question for it to resolve. The court concluded that it could consider the exhibits, "which would seem to [conclusively] establish that there was a sublease in February of 1993, and, more importantly a sublease which included the common areas in 1994."

---

[20] This resolves the Albillos' argument on appeal that the Sublease exhibits were not admitted into evidence until the day after the nonsuit was granted. As the trial court noted, the exhibits could have been admitted earlier, as counsel for the Albillos represented that he would not object. In addition, the Albillos failed to include the reporter's transcript for March 6, 2014, the day the defense exhibits were admitted, in the record on appeal. We therefore are unable to determine whether counsel for the Albillos raised an objection to the admission of these exhibits at that time. We find no error under these circumstances.

19

The motion for nonsuit was not made until March 4, 2014, several days after the extensive argument on the impact of the applicable standard of duty in light of the sublease to the Chos. Under these circumstances, we conclude that the trial court did not err in considering the sublease exhibits and Stahl's testimony.

B.      *The Third Amendment to the Sublease*

The Albillos complain that although it is referenced in the record, a third amendment to the Sublease in 1998 was not presented to the court. They contend that this omission renders reliance on the terms of the First and Second Amendments to the Sublease improper because the third amendment may have changed those provisions.

As noted above, we have reviewed the entire record, including the reporter's transcripts and the appendices submitted by both sides. (*Fillpoint v. Maas, supra,* 208 Cal.App.4th at p. 1176.) The third amendment to the Sublease was submitted to the court by the Albillos as part of their opposition to POC's motion in limine number seven. It was not brought to the attention of the trial court in the proceedings on the nonsuit. We have reviewed the third amendment, which redefined the Demised Premises. But it does not change the language from the First Amendment to the Sublease (exhibit 103) which provided that the Demised Premises included "all common areas of the 'Asian Village' as cross-hatched on Exhibit 'A.'" The only relevant substantive change in the third amendment is the name change from "Asian Village" to "Asian Village/Pan Pacific Village."

Since the language relevant to the issue of the Chos' possession of the property where Oscar fell was not changed in the third amendment, we conclude that any error related to its omission from the proceedings on the nonsuit was harmless.

C.      *Approval of the Assignment of the Sublease to Chos*

The Albillos argue that POC failed to present admissible evidence that the site of the fall was subleased to the Chos because there was no evidence the assignment was approved by the Harbor Commission as required by the Master Lease. They did not make this argument in opposition to the motion for nonsuit. We will not consider an

20

argument not advanced in the trial court.  (*DiCola v. White Bros. Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676 (*DiCola*).) [21]

## II

### The Albillos' Challenges on the Merits

We turn to a review of the nonsuit motion.  The existence of a dangerous condition at the site of Oscar's fall is uncontested on appeal.  The Albillos challenge the trial court's findings that the Chos were in possession of the property and that the Albillos were therefore required to prove that POC, as a landlord out of possession of the premises, had actual notice of the dangerous condition. [22]

### A.    Standard of Review

"'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his [or her] favor.'  [Citation.]  'A motion for nonsuit . . . concedes the truth of the facts proved, but denies as a matter of law that they sustain the plaintiff's case.  A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference, which may be drawn from the evidence, it determines there is no substantial evidence to support a judgment in the plaintiff's favor.  [Citations.]'  (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27–28.)  Because motions for nonsuit raise issues of law (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1542), 'we review the rulings on those motions de novo, employing the same standard which governs the trial court [citation].'  (*Id.* at pp. 1541–1542.)"  (*M&F Fishing*, *supra*, 202 Cal.App.4th at p. 1532.)

---

[21] Even if the Albillos had not forfeited this argument, it would fail on the merits.  The Supplemental Brief filed by POC on February 28, 2014 included the Harbor Commission's approval of the sublease to 3T Marketing and the assignment of the sublease from 3T Marketing to the Chos.

[22] For the first time in their opening brief, the Albillos raise an alternative theory that POC may be liable for failing to warn patrons even if the dangerous condition was on Nagoya Way, which is controlled by City.  We will not consider this argument because it was not advanced in the trial court.  (*DiCola*, *supra*, 158 Cal.App.4th at p. 676.)

21

On appeal, the Albillos argue that they presented a prima facie case that a dangerous condition existed on premises possessed and controlled by POC. They rely on *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200 for the proposition that they need not establish that POC had actual knowledge of the dangerous condition, contending that evidence of constructive knowledge is sufficient. *Ortega* is inapposite because the defendant was the owner of the premises, so that the general rule of constructive knowledge applied. (*Id.* at pp. 1204-1206.) The case did not address the attenuated duty of a landlord who has relinquished possession and control of a premises to a subtenant.

The Albillos' prima facie case is based on the evidence they presented in their case in chief that POC was in possession of the location of the fall under the Master Lease. Having rejected their procedural challenges to the additional evidence considered by the court, we now consider that evidence to determine, de novo, whether the Chos, rather than POC, were in possession of the location at the time of the fall.

B.     *Possession and Control*

California courts recognize that a landlord has an attenuated duty of care to the guest of a tenant. "'Because a landlord has relinquished possessory interest in the land, his or her duty of care to third parties injured on the land is attenuated as compared with the tenant who enjoys possession and control. Thus, before liability may be thrust on a landlord for a third party's injury due to a dangerous condition on the land, the plaintiff must show that the landlord had actual knowledge of the dangerous condition in question, plus the right and ability to cure the condition."' (*Stone*, *supra*, 163 Cal.App.4th 608, 612, quoting *Mata v. Mata* (2003) 105 Cal.App.4th 1121, 1131-1132, disapproved in part on another ground in *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 247-250.)

Applying that principle, the court in *Uccello v. Laudenslayer, supra,* 44 Cal.App.3d at p. 504, held that "a landlord is under no duty to inspect the premises for the purpose of discovering the existence of a tenant's dangerous animal; only when the landlord has actual knowledge of the animal, coupled with the right to have it removed from the premises, does a duty of care arise." (*Id*. at p. 514; see also *Salinas v. Martin*

22

(2008) 166 Cal.App.4th 404, 412; *Stone, supra*, 163 Cal.App.4th at p. 608 [slip and fall at restaurant].)

The trial court concluded that POC subleased its entire interest in the Demised Premises, including the location of the fall. The Sublease, as revised by the First Amendment, included all common areas, as cross-hatched on the attached Exhibit A in the definition of Demised Premises. In addition, language in paragraph 7 of the Sublease defines common areas as including "entries to the Demised Premises" and "walkways."

We apply the standard rules of contract interpretation, a judicial function. (*Jade Fashion & Co. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 651 (*Jade*).) The court must give effect to the mutual intent of the parties as of the time the agreement was executed. (*Ibid.*) "'Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. [Citations.]" (*Ibid.*) The court follows a three-step process when the meaning of a contract is disputed. "First, it provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.] If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract. [Citations.] When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law. [Citations.] This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation. [Citations.]'" (*Id.* at pp. 651-652, quoting *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-1126.) We review a trial court's interpretation of a contract de novo where there was no conflicting evidence presented. (*Union Pacific R.R. Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 156.)

The parties and the court addressed two ambiguities regarding whether POC relinquished possession and control over the site of the fall to the Chos through the assignment of the sublease. The first concerned the description of the Demised Premises

23

by reference to cross-hatching in the map marked as Exhibit A to the First Amendment to the Sublease. The second concerned a discrepancy between the square footage noted on that map and the square footage stated in the description of the Demised Premises in the various lease documents.

*1. Cross-Hatchings on Exhibit A*

POC argued that the sublease intended to convey all of the premises, including all of Parcel 21A, to the subtenants. The Albillos contended that the cross-hatch markings on Exhibit A to the First Amendment to the Sublease did not extend into Parcel 21A, leaving a narrow strip of property that was reserved by POC and not assigned to 3T Marketing or their assignees, the Chos. The trial court examined Exhibit A and concluded that it was "not at all clear," although it had been enlarged on the courtroom audiovisual equipment. We also have examined a smaller version of Exhibit A included in the appellants' appendix and find it ambiguous as well.

The trial court concluded that extrinsic evidence was necessary to determine the intent of the parties. Stahl's uncontradicted testimony at the nonsuit hearing was that POC did not intend to retain possession of any part of the area of Pan Pacific Village, including the location where the fall occurred. POC understood that area was transferred to the possession and control of the various subtenants. The subtenants in possession at the time of Oscar's fall were the Chos.

Based on this record, we conclude that the reasonable interpretation of the sublease as amended was that POC intended to transfer possession of the entire area of Pan Pacific Village, including the entry where Oscar fell, to the Chos. (See Civ. Code, § 1643, requiring an interpretation of a contract as will make it reasonable.)

*2. Square Footage*

The Albillos pointed out that the both the Sublease and the First Amendment to the Sublease describe the Demised Premises as an area of approximately 15,046 square feet, including a number of parcels bearing the designation "F" plus a number, and the cross-hatched area on Exhibit A. The parcels with the "F" designation do not appear on Exhibit A. The map shows, among other parcels, Parcel 13 and 21A. The square footage

24

of Parcel 13 on Exhibit A is 19,157 square feet and Parcel 21A is 2,566 square feet. These numbers do not total 15,046 as described in the lease documents.

The Albillos argued that the jury should have resolved this ambiguity. We disagree. The extrinsic evidence submitted at the hearing on nonsuit (Stahl's testimony) was uncontradicted. Where there is no material conflict in the extrinsic evidence, the contract is interpreted as a matter of law, even when conflicting inferences may be drawn, or the contract terms are susceptible to more than one reasonable interpretation. (*Jade*, *supra*, 229 Cal.App.4th at p. 652.)

The undisputed evidence was that POC was a landlord no longer in possession because of the sublease and subsequent assignments. The Chos were in possession at the time of the fall, and had maintained the area since their tenancy began. We conclude that the trial court correctly held that the Albillos were required to prove POC had actual notice of the dangerous condition.

*3. POC's Right to Enter and Repair*

The Albillos argued that even if the area where Oscar fell was subleased to the Chos, POC retained the right to enter and make repairs to the area under the terms of the Master Lease and the Sublease. They acknowledge the general rule that a commercial landlord's right to enter the premises to inspect and make repairs is not sufficient evidence of an agreement that the landlord has not surrendered possession and control to the tenant. (*Mora v. Baker Commodities, Inc.* (1989) 210 Cal.App.3d 771, 780-781.) In *Mora,* a landlord subleased a commercial premises with express lease language giving it the right to enter the premises and make repairs. The Court of Appeal held that the landlord owed no duty once the premises were transferred to the tenant if the premises were safe when the tenant took possession. (*Id.* at pp. 780-781.)

The Albillos contend that under the terms of the Master Lease POC was required to maintain the premises in a safe condition at all times, and that this language overrides the language of the Sublease, which incorporated the Master Lease. They concede that under the Sublease, the Chos were responsible for all repairs and maintenance other than those reserved to POC, and that POC was not responsible for maintaining or repairing the

25

pedestrian thoroughfare marked as Parcel 21A.  The Albillos contend that under these circumstances, POC and the Chos shared the maintenance and repair duties.

In their reply brief, the Albillos cite testimony by Stahl from their case in chief that POC, at the request of the Chos, built a sidewalk in the Demised Premises in 2004. The Chos paid for the work, which was contracted through POC's parent company.  Stahl explained that this work was done on the north side of the Pan Pacific Village, an entirely different area than the site of the fall on the west side.

The Master Lease contains a requirement that the "[l]essee shall maintain the [property] and improvements at all times in a safe, clean . . . condition and in conformity with all applicable federal, state, municipal and other laws and regulations. . . . Paragraph 12A of the sublease allowed POC to enter the subleased premises "to do any act or thing which [(POC)] may be obligated to do pursuant to the bylaws, government regulation, the Master Lease or sublease or otherwise."  But paragraph 12C expressly states that "[N]othing in this paragraph shall be construed to impose upon (POC) any obligations to construct, maintain or make repairs, replacements, alterations or additions, nor shall it create any liability for any failure to do so, except to the extent as [(POC)] may have a duty to repair pursuant to this Sublease.  Our reading of the Sublease, together with the Master Lease, is that POC assigned its responsibilities for maintenance and control of the Demised Premises to the Chos.  This was also Stahl's uncontradicted testimony in the hearing on nonsuit.

*4. Easement*

The Albillos now argue that the interest POC sublet to the Chos was an easement, which left POC with a possessory interest in the site of the fall.  The argument is based on language in the Master Lease which gave POC ingress and egress rights only over Parcel 21A.  The Sublease gave ABC a non-exclusive license to use common areas.  The Albillos cite authority that an easement is not an estate in property, as is a lease.  (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 35 (*Golden West*).) This argument was not made at the nonsuit hearing.  We will not consider an argument not advanced in the trial court.  (*DiCola*, *supra*, 158 Cal.App.4th at p. 676.)

26

Even if the issue had been preserved, we conclude that the question remains whether POC had control over the area at issue. The court in *Golden West* concluded that labels such as easements were not useful in determining the scope of the rights and duties between the parties. (25 Cal.App.4th at pp. 37-38.) The case did not involve the duty of a landlord in tort, but instead was a real property dispute.

The issue of a duty of care in a tort case where the defendant holds an easement was addressed in *Cody F. v. Falletti* (2001) 92 Cal.App.4th 1232. The defendants in that action held an easement over a road in a planned unit development that ran in front of a home occupied by the owner of 20 vicious dogs who ran outside and attacked the minor plaintiff. The court held that "[a]n easement interest does not *necessarily* translate into a tort duty." (*Id.* at p. 1243, italics added.) The evidence was that the defendants did not have a right of control over the road or the dogs. The lack of control was central to the *Cody F.* court's reasoning: "The nature of the duty owed by the owner of an interest in real property must have a relationship to the degree of control conferred by the scope of the ownership interest itself." (*Id.* at p. 1243.) Unlike the evidence in *Cody F.*, the evidence at the nonsuit hearing was that the Chos had control over the area of Oscar's fall.

C.    *Evidence of Actual Notice*

Having determined that the Chos were in possession, the Albillos had to show proof of POC's actual knowledge of the dangerous condition. The Albillos argue that they presented sufficient evidence of POC's actual notice of the dangerous condition in the entry to the Pan Pacific Village to raise a duty of care by POC and overcome the nonsuit motion. They cite Stahl's testimony that "POC" walked the property four to five times a year. Stahl walked the property personally two to four times a year. He parked in the parking lot on Nagoya Way and crossed Nagoya Way to enter. Stahl said that when visiting, he entered "through various areas," referring to an unidentified photograph in Exhibit 4. He explained that Pan Pacific Village has a long frontage along Nagoya Way and that the transition from the public street onto the development is different from place

27

to place. Once or twice a year he entered Pan Pacific Village through the Asian Entry Statement.

The evidence in the case-in-chief was that the dangerous condition was difficult to see. Avrit, the safety expert, testified that the condition where Oscar fell was dangerous not only because of the height differential, "but it's low enough that it's difficult to perceive; it doesn't readily stand out. So it's not obvious that there's a problem in this area. . . ." In light of this evidence, the jury could not reasonably infer that Stahl would have seen the dangerous condition when he entered the property at various locations at the entrance to the Pan Pacific Village.

Stahl did not recall any noticeable change to the area depicted on exhibit 7-013 in the twelve months before he visited at an unspecified time in 2010. He did not recall seeing the area between mid-2011 and 2012, so he could not speculate on any change to the area between the bollards. Stahl was not aware of anything other than normal cleaning and maintenance by the subtenant in the area in front of the Pan Pacific Village since 1992.

Stahl testified that approximately 3,000 visitors come to Ports O'Call Village every week. If POC received a complaint about needed repairs, it notified the subtenant who is responsible for that area. POC had never received a complaint about the area where Oscar tripped in the two years before the incident. POC does not have an office at Ports O'Call Village. Stahl found no record of repair in the POC offices for the area in front of the Pan Pacific Village. Because Ports O'Call Village is a very large area, Stahl could not say whether he had noticed the appearance of the area between the asphalt and cement sidewalk where Oscar fell. He first learned of Oscar's fall when served with the complaint in 2012.

A landlord's denial of actual knowledge of a dangerous condition "'will not, per se, prevent liability. [Citations.] However, actual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not based on speculation or conjecture. Only where the circumstances are such that the defendant "must have known" and not "should have known" will an inference of actual knowledge

28

be permitted.  [Citation.]'" (*Yuzon v. Collins* (2004) 116 Cal.App.4th 149, 163, citing [*Uccello*, *supra*, 44 Cal.App.3d] at p. 514, fn. 4 [no showing landlord had actual knowledge absent evidence he was aware of presence of particular dog who attacked visitor, or of that dog's dangerous propensities)].)

Like the trial court, we conclude that the Albillos failed to present sufficient testimony in their case-in-chief to establish POC had actual notice of the dangerous condition.  The inferences they attempt to make from Stahl's testimony are too speculative.  There was no evidence that Stahl walked over the area where the dangerous condition existed, or that anyone else acting on behalf of POC was aware of it.  We may not reverse a nonsuit on the basis of evidence that is speculative.  (*Avidor v. Sutter's Place, Inc.* (2013) 212 Cal.App.4th 1439, 1455, citing *Wolf*, *supra*, 162 Cal.App.4th at pp. 1124-1125.)

In sum, we conclude that the trial court properly considered both the exhibits and testimony submitted at the hearing on nonsuit.  These established that POC surrendered possession and control of the area of the fall to the Chos.  The Albillos were therefore required to prove that POC had actual notice of the dangerous condition in order to establish that POC owed them a duty of care.  The evidence they presented in their case-in-chief did not satisfy this burden.  Nonsuit was proper under these circumstances, and we affirm on that basis.  In light of our conclusion that the Albillos were required to prove actual notice by POC, we do not reach their alternative arguments regarding proof of constructive notice.

29

## DISPOSITION

The judgment of nonsuit in favor of POC is affirmed.  POC is awarded its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

WILLHITE, Acting P. J.

MANELLA, J.